## APODACA ET AL. *v.* OREGON

No. 69–5046. Argued March 1, 1971—Reargued January 10, 1972—
Decided May 22, 1972

WHITE, J., announced the ·Court's judgment and delivered an opinion, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined. BLACKMUN, J., filed a concurring opinion, *ante*, p. 365. POWELL, J., filed an opinion concurring in the judgment, *ante*, p. 366. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *ante*, p. 380. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *ante*, p. 395. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 414. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *ante*, p. 399.

*Richard B. Sobol* reargued the cause and filed briefs for petitioners.

*Jacob B. Tanzer*, Solicitor General of Oregon, reargued the cause for respondent. With him on the brief were *Lee Johnson*, Attorney General, and *Thomas H. Denney*, Assistant Attorney General.

Briefs of *amici curiae* urging reversal were filed by *James J. Doherty* and *Marshall J. Hartman* for the National Legal Aid and Defender Association, and by *Norman Dorsen, Melvin L. Wulf*, and *Paul R. Meyer* for the American Civil Liberties Union.

MR. JUSTICE WHITE announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST joined.

Robert Apodaca, Henry Morgan Cooper, Jr., and James Arnold Madden were convicted respectively of assault with a deadly weapon, burglary in a dwelling, and

grand larceny before separate Oregon juries, all of which returned less-than-unanimous verdicts. The vote in the cases of Apodaca and Madden was 11–1, while the vote in the case of Cooper was 10–2, the minimum requisite vote under Oregon law for sustaining a conviction.[1] After their convictions had been affirmed by the Oregon Court of Appeals, 1 Ore. App. 483, 462 P. 2d 691 (1969), and review had been denied by the Supreme Court of Oregon, all three sought review in this Court upon a claim that conviction of crime by a less-than-unanimous jury violates the right to trial by jury in criminal cases specified by the Sixth Amendment and made applicable to the States by the Fourteenth. See *Duncan* v. *Louisiana,* 391 U. S. 145 (1968). We granted certiorari to consider this claim, 400 U. S. 901 (1970), which we now find to be without merit.

In *Williams* v. *Florida,* 399 U. S. 78 (1970), we had occasion to consider a related issue: whether the Sixth Amendment's right to trial by jury requires that all juries consist of 12 men. After considering the history of the 12-man requirement and the functions it performs in contemporary society, we concluded that it was not of constitutional stature. We reach the same conclusion today with regard to the requirement of unanimity.

---

[1] Ore. Const., Art. I, § 11, reads in relevant part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; . . . provided, however, that any accused person, in other than capital cases, and with the consent of the trial judge, may elect to waive trial by jury and consent to be tried by the judge of the court alone, such election to be in writing; provided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise . . . ."

# I

Like the requirement that juries consist of 12 men, the requirement of unanimity arose during the Middle Ages [2]

[2] The origins of the unanimity rule are shrouded in obscurity, although it was only in the latter half of the 14th century that it became settled that a verdict had to be unanimous. See 1 W. Holdsworth, A History of English Law 318 (1956); Thayer, The Jury and its Development, 5 Harv. L. Rev. (pts. 1 and 2) 249, 295, 296 (1892). At least four explanations might be given for the development of unanimity. One theory is that unanimity developed to compensate for the lack of other rules insuring that a defendant received a fair trial. See L. Orfield, Criminal Procedure from Arrest to Appeal 347–351 (1947); Haralson, Unanimous Jury Verdicts in Criminal Cases, 21 Miss. L. J. 185, 191 (1950). A second theory is that unanimity arose out of the practice in the ancient mode of trial by compurgation of adding to the original number of 12 compurgators until one party had 12 compurgators supporting his position; the argument is that when this technique of afforcement was abandoned, the requirement that one side obtain the votes of all 12 jurors remained. See P. Devlin, Trial by Jury 48–49 (1956); Ryan, Less than Unanimous Jury Verdicts in Criminal Trials, 58 J. Crim. L. C. & P. S. 211, 213 (1967). A third possibility is that unanimity developed because early juries, unlike juries today, personally had knowledge of the facts of a case; the medieval mind assumed there could be only one correct view of the facts, and, if either all the jurors or only a minority thereof declared the facts erroneously, they might be punished for perjury. See T. Plucknett, A Concise History of the Common Law 131 (5th ed. 1956); Thayer, *supra*, at 297. Given a view that minority jurors were guilty of criminal perjury, the development of a practice of unanimity would not be surprising. The final explanation is that jury unanimity arose out of the medieval concept of consent. Indeed, "[t]he word consent (*consensus*) carried with it the idea of *concordia* or unanimity. . . ." M. Clarke, Medieval Representation and Consent 251 (1964). Even in 14th-century Parliaments there is evidence that a majority vote was deemed insufficient to bind the community or individual members of the community to a legal decision, see *id.*, at 335–336; Plucknett, The Lancastrian Constitution, in Tudor Studies 161, 169–170 (R. Seton-Watson ed. 1924); a unanimous decision was preferred. It was only in the 15th century that the decisionmaking process in Parliament became avowedly majoritarian, see 1 K. Pickthorn, Early

and had become an accepted feature of the common-law jury by the 18th century.[3] But, as we observed in *Williams*, "the relevant constitutional history casts considerable doubt on the easy assumption [4]. . . that if a

Tudor Government: Henry VII, p. 93 (1967), as the ideal of unanimity became increasingly difficult to attain. See Clarke, *supra*, at 266–267. For evidence in 18th-century America of a similar concern that decisions binding on the community be taken unanimously, see Zuckerman, The Social Context of Democracy in Massachusetts, 25 Wm. & Mary Q. (3d ser.) 523, 526–527, 540–544 (1968).

[3] See 3 W. Blackstone, Commentaries *375–376. Four 18th-century state constitutions provided explicitly for unanimous jury verdicts in criminal cases, see N. C. Const. of 1776, Art. IX; Pa. Const. of 1776, Art. IX; Vt. Const. of 1786, Art. XI; Va. Const. of 1776, § 8; while other 18th-century state constitutions provided for trial by jury according to the course of the common law, see Md. Const. of 1776, Art. III, or that trial by jury would remain "inviolate," see Ga. Const. of 1777, Art. LXI; Ky. Const. of 1792, Art. XII, § 6; N. Y. Const. of 1777, Art. XLI; Tenn. Const. of 1796, Art. XI, § 6; be "confirmed," see N. J. Const. of 1776, Art. XXII; or remain "as heretofore." See Del. Const. of 1792, Art. I, § 4; Ky. Const. of 1792, Art. XII, § 6; S. C. Const. of 1790, Art. IX, § 6. See also *Apthorp* v. *Backus*, 1 Kirby 407, 416–417 (Conn. 1788); *Grinnell* v. *Phillips*, 1 Mass. 530, 542 (1805). Although unanimity had not been the invariable practice in 17th-century America, where majority verdicts were permitted in the Carolinas, Connecticut, and Pennsylvania, see *Williams* v. *Florida*, 399 U. S. 78, 98 n. 45 (1970), the explicit constitutional provisions, particularly of States such as North Carolina and Pennsylvania, the apparent change of practice in Connecticut, and the unquestioning acceptance of the unanimity rule by text writers such as St. George Tucker indicate that unanimity became the accepted rule during the 18th century, as Americans became more familiar with the details of English common law and adopted those details in their own colonial legal systems. See generally Murrin, The Legal Transformation: The Bench and Bar of Eighteenth-Century Massachusetts, in Colonial America: Essays in Politics and Social Development 415 (S. Katz ed. 1971). See also F. Heller, The Sixth Amendment 13–21 (1951).

[4] See *Andres* v. *United States*, 333 U. S. 740, 748 (1948); *Maxwell* v. *Dow*, 176 U. S. 581, 586 (1900) (dictum). Cf. *Springville* v. *Thomas*, 166 U. S. 707 (1897); *American Publishing Co.* v. *Fisher*, 166 U. S. 464 (1897).

given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Constitution." *Id.*, at 92–93. The most salient fact in the scanty history of the Sixth Amendment, which we reviewed in full in *Williams,* is that, as it was introduced by James Madison in the House of Representatives, the proposed Amendment provided for trial

> "by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites . . . ." 1 Annals of Cong. 435 (1789).

Although it passed the House with little alteration, this proposal ran into considerable opposition in the Senate, particularly with regard to the vicinage requirement of the House version. The draft of the proposed Amendment was returned to the House in considerably altered form, and a conference committee was appointed. That committee refused to accept not only the original House language but also an alternate suggestion by the House conferees that juries be defined as possessing "the accustomed requisites." Letter from James Madison to Edmund Pendleton, Sept. 23, 1789, in 5 Writings of James Madison 424 (G. Hunt ed. 1904). Instead, the Amendment that ultimately emerged from the committee and then from Congress and the States provided only for trial

> "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."

As we observed in *Williams,* one can draw conflicting inferences from this legislative history. One possible inference is that Congress eliminated references to unanimity and to the other "accustomed requisites" of the jury because those requisites were thought already to be

implicit in the very concept of jury. A contrary explanation, which we found in *Williams* to be the more plausible, is that the deletion was intended to have some substantive effect. See 399 U. S., at 96–97. Surely one fact that is absolutely clear from this history is that, after a proposal had been made to specify precisely which of the common-law requisites of the jury were to be preserved by the Constitution, the Framers explicitly rejected the proposal and instead left such specification to the future. As in *Williams,* we must accordingly consider what is meant by the concept "jury" and determine whether a feature commonly associated with it is constitutionally required. And, as in *Williams,* our inability to divine "the intent of the Framers" when they eliminated references to the "accustomed requisites" requires that in determining what is meant by a jury we must turn to other than purely historical considerations.

## II

Our inquiry must focus upon the function served by the jury in contemporary society. Cf. *Williams* v. *Florida, supra,* at 99–100. As we said in *Duncan,* the purpose of trial by jury is to prevent oppression by the Government by providing a "safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan* v. *Louisiana,* 391 U. S., at 156. "Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen . . . ." *Williams* v. *Florida, supra,* at 100. A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment. As we said in *Williams,* a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to de-

liberate, free from outside attempts at intimidation, on the question of a defendant's guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where nonunanimous juries will convict or acquit.[5] But in either case, the interest of the defendant in having the judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served.

## III

Petitioners nevertheless argue that unanimity serves other purposes constitutionally essential to the continued operation of the jury system. Their principal contention is that a Sixth Amendment "jury trial" made mandatory on the States by virtue of the Due Process Clause of the Fourteenth Amendment, *Duncan* v. *Louisiana, supra,* should be held to require a unanimous jury verdict in order to give substance to the reasonable-doubt standard otherwise mandated by the Due Process Clause. See *In re Winship,* 397 U. S. 358, 363–364 (1970).

We are quite sure, however, that the Sixth Amendment itself has never been held to require proof beyond a reasonable doubt in criminal cases. The reasonable-doubt standard developed separately from both the jury trial and the unanimous verdict. As the Court noted in the *Winship* case, the rule requiring proof of crime beyond a reasonable doubt did not crystallize in this country until after the Constitution was adopted. See

---

[5] The most complete statistical study of jury behavior has come to the conclusion that when juries are required to be unanimous, "the probability that an acquittal minority will hang the jury is about as great as that a guilty minority will hang it." H. Kalven & H. Zeisel, The American Jury 461 (1966).

*id.,* at 361.[6] And in that case, which held such a burden of proof to be constitutionally required, the Court purported to draw no support from the Sixth Amendment.

Petitioners' argument that the Sixth Amendment requires jury unanimity in order to give effect to the reasonable-doubt standard thus founders on the fact that the Sixth Amendment does not require proof beyond a reasonable doubt at all. The reasonable-doubt argument is rooted, in effect, in due process and has been rejected in *Johnson* v. *Louisiana, ante,* p. 356.

## IV

Petitioners also cite quite accurately a long line of decisions of this Court upholding the principle that the Fourteenth Amendment requires jury panels to reflect a cross section of the community. See, *e. g., Whitus* v. *Georgia,* 385 U. S. 545 (1967); *Smith* v. *Texas,* 311 U. S. 128 (1940); *Norris* v. *Alabama,* 294 U. S. 587 (1935); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880). They then contend that unanimity is a necessary precondition for effective application of the cross-section require-

---

[6] For the history of the reasonable-doubt requirement, see generally C. McCormick, Evidence § 321 (1954); 9 J. Wigmore, Evidence § 2497 (3d ed. 1940); May, Some Rules of Evidence—Reasonable Doubt in Civil and Criminal Cases, 10 Am. L. Rev. 642, 651–660 (1876). (See 69 U. S. L. Rev. 169, 172 (1935).) According to May and McCormick, the requirement of proof beyond a reasonable doubt first crystallized in the case of *Rex* v. *Finny,* a high treason case tried in Dublin in 1798 and reported in 1 L. MacNally, Rules of Evidence on Pleas of the Crown *4 (1811). Confusion about the rule persisted in the United States in the early 19th century, where it was applied in civil as well as criminal cases, see, *e. g., Ropps* v. *Barker,* 21 Mass. (4 Pick.) 239, 242 (1826); it was only in the latter half of the century that the reasonable-doubt standard ceased to be applied in civil cases, see *Ellis* v. *Buzzell,* 60 Me. 209 (1872), and that American courts began applying it in its modern form in criminal cases. See *Commonwealth* v. *Webster,* 59 Mass. (5 Cush.) 295, 320 (1850). See generally May, *supra.*

ment, because a rule permitting less than unanimous verdicts will make it possible for convictions to occur without the acquiescence of minority elements within the community.

There are two flaws in this argument. One is petitioners' assumption that every distinct voice in the community has a right to be represented on every jury and a right to prevent conviction of a defendant in any case. All that the Constitution forbids, however, is systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been systematically excluded. See *Swain* v. *Alabama,* 380 U. S. 202, 208–209 (1965); *Cassell* v. *Texas,* 339 U. S. 282, 286–287 (1950); *Akins* v. *Texas,* 325 U. S. 398, 403–404 (1945); *Ruthenberg* v. *United States,* 245 U. S. 480 (1918). No group, in short, has the right to block convictions; it has only the right to participate in the overall legal processes by which criminal guilt and innocence are determined.

We also cannot accept petitioners' second assumption— that minority groups, even when they are represented on a jury, will not adequately represent the viewpoint of those groups simply because they may be outvoted in the final result. They will be present during all deliberations, and their views will be heard. We cannot assume that the majority of the jury will refuse to weigh the evidence and reach a decision upon rational grounds, just as it must now do in order to obtain unanimous verdicts, or that a majority will deprive a man of his liberty on the basis of prejudice when a minority is presenting a reasonable argument in favor of acquittal. We simply find no proof for the notion that a majority will disregard its instructions and cast its votes for guilt

or innocence based on prejudice rather than the evidence.

We accordingly affirm the judgment of the Court of Appeals of Oregon.

*It is so ordered.*

[For concurring opinion of BLACKMUN, J., see *ante,* p. 365.]

[For opinion of POWELL, J., concurring in judgment, see *ante,* p. 366.]

[For dissenting opinion of DOUGLAS, J., see *ante,* p. 380.]

[For dissenting opinion of BRENNAN, J., see *ante,* p. 395.]

[For dissenting opinion of MARSHALL, J., see *ante,* p. 399.]

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

In *Duncan* v. *Louisiana,* 391 U. S. 145, the Court squarely held that the Sixth Amendment right to trial by jury in a federal criminal case is made wholly applicable to state criminal trials by the Fourteenth Amendment. Unless *Duncan* is to be overruled, therefore, the only relevant question here is whether the Sixth Amendment's guarantee of trial by jury embraces a guarantee that the verdict of the jury must be unanimous. The answer to that question is clearly "yes," as my Brother POWELL has cogently demonstrated in that part of his concurring opinion that reviews almost a century of Sixth Amendment adjudication.*

Until today, it has been universally understood that a unanimous verdict is an essential element of a Sixth Amendment jury trial. See *Andres* v. *United States,* 333 U. S. 740, 748; *Patton* v. *United States,* 281 U. S.

---

*See *ante,* at 369–371 (POWELL, J., concurring in judgment).

276, 288; *Hawaii* v. *Mankichi,* 190 U. S. 197, 211–212; *Maxwell* v. *Dow,* 176 U. S. 581, 586; *Thompson* v. *Utah,* 170 U. S. 343, 351, 353; cf. 2 J. Story, Commentaries on the Constitution § 1779 n. 2 (5th ed. 1891).

I would follow these settled Sixth Amendment precedents and reverse the judgment before us.