Harold **WHORTON**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
Appellee.

Supreme Court of Kentucky.

July 25, 1978.

Rehearing Denied Oct. 10, 1978.

Terrence R. Fitzgerald, Deputy Public Defender, Daniel T. Goyette, Associate Director, Louisville, for appellant.

Robert F. Stephens, Atty. Gen., Victor Fox, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Chief Justice.

Harold Whorton appeals from a judgment sentencing him to consecutive terms aggregating 230 years of imprisonment pursuant to a verdict finding him guilty on 10 counts of 1st-degree robbery, two counts of 1st-degree wanton endangerment, and two counts of 1st-degree attempted robbery.

The various charges grew out of three separate incidents. At a pre-daylight hour

on May 15, 1976, a black male entered the Krispy Kreme Doughnut Shop in or near Shively carrying a pistol in one hand and a knife in the other. He proceeded to rob the store and three of its employes. The three employes later identified Whorton as the robber. Late in the evening of the same day a black male carrying a gun in one hand and a knife in the other entered and robbed the Burger Chef Restaurant on Shelbyville Road. Two of the restaurant employes then present in the restaurant later identified Whorton as the robber. On June 1, 1976, around midnight, a man came into Jerry's Restaurant on Brownsboro Road and, after ordering two cheeseburgers, stuck a gun in the face of the waitress, announced that "this is a robbery," and asked for the manager, who was in the back of the restaurant. When the manager came up front the robber herded all of the patrons and employes together, took the money from the customers' wallets, forced the manager to give him the money from a safe, and left the assembled company together in a back room before leaving. Meanwhile, however, one of the customers managed to sneak away unnoticed and called the police from another restaurant across the street. Shortly thereafter a police officer gave chase to an automobile departing the vicinity and ran it down when it struck a fire hydrant. Whorton emerged from the automobile and pointed a pistol at the officer, but dropped it when commanded to do so. Whorton and a companion were taken at once to Jerry's Restaurant, where 10 of the persons present during the robbery identified Whorton as the robber.

During the episode at Jerry's Restaurant, while he was directing the employes and patrons into the rear area of the premises, Whorton said, "If you don't think I'll shoot you, I'll prove it," and fired a shot into the ceiling. This particular act on his part was the basis for one of the wanton endangerment charges (the other endangerment count was for pointing a gun at the arresting officer), pursuant to which he was sentenced to five years in the penitentiary.

Whorton did not testify. The only evidence in his defense was given by his wife and her sister, who offered alibi testimony with regard to his whereabouts during the night on which the doughnut-shop robbery occurred.

Prior to the trial Whorton moved, among other things, that the issues of guilt or innocence be submitted to the jury separately from the fixing of the penalty or penalties, in order that he might appear as a witness only at the second stage for the purpose of showing mitigating circumstances, including his valorous military service during the Korean Conflict. Although neither our statutes nor rules of court authorize such a bifurcation except in persistent-offender and capital cases (cf. KRS 532.080, KRS 532.025(1)(b)), he contends that the trial court's refusal to grant it deprived him of a fair trial.

At the close of the evidence and before the jury was instructed, counsel for Whorton tendered several federal-court type instructions which the trial court declined to give. One of these, undertaking to define reasonable doubt, was as follows:

"A reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence. It is rarely possible to prove anything to an absolute certainty. The meaning of the rule is that the proof must be such as to exclude, not every hypothesis or possibility of innocence, but any fair and rational hypothesis except that of guilt; what is required is not an absolute or mathematical certainty but a moral certainty. An accused is not to be convicted on mere suspicion or conjecture. A reasonable doubt may arise, not only from the evidence produced, but also from a lack of evidence. Since the burden is upon the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged, an accused has the right to rely upon failure of the prosecution to establish such proof. (An accused may also rely upon evidence brought out on cross-examination of witnesses for the prosecution.) The law does not impose upon an accused the duty of

producing any evidence. A reasonable doubt exists in any case when, after careful and impartial consideration of all the evidence, the jury members do not feel convinced to a moral certainty that an accused is guilty of the offense(s) charged."

Another, instructing on the presumption of innocence, and substantially similar to the one offered and refused in *Taylor v. Kentucky,* —— U.S. ——, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), was as follows:

"The law presumes an accused to be innocent of crime. He begins the trial with a clean slate, with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. So the presumption of innocence alone is sufficient to acquit an accused unless the jury members are satisfied beyond a reasonable doubt of the accused's guilt from all the evidence in the case."

As given by the trial court, each of the instructions covering the various charges submitted to the jury authorized a finding of guilt only if the jury believed, (a) from the evidence and (b) beyond a reasonable doubt, that the defendant had committed the acts, with the requisite criminal intent, that constituted the respective offense. In addition, and as directed by RCr 9.56[1], the jury was specially instructed that if upon the whole case it had a reasonable doubt as to the defendant's guilt it was required to find him not guilty and, as to those charges on which the instructions embraced more than one degree of the offense, that if it found the defendant guilty but had a reasonable doubt as to the degree it was required to find him guilty of the lower degree. The special instruction on reasonable doubt defined the term as "a substantial doubt, a real doubt, in that you must ask yourself not whether a better case might have been proven but whether, after hearing all the evidence, you actually doubt that the defendant is guilty." This definition

originated, of course, from a passage contained in *Merritt v. Commonwealth,* Ky., 386 S.W.2d 727, 729 (1965). It was specifically approved for inclusion as a part of the instructions for criminal cases in *Whitaker v. Commonwealth,* Ky., 418 S.W.2d 750, 752 (1967), and subsequently has been upheld in numerous cases.[2]

■ With regard to the request for a bifurcated trial, the argument is that the 5th-Amendment right of silence is diluted, or "chilled," by the fact that if a defendant elects to avail himself of its protection he pays a penalty in not being able to give mitigating testimony pertinent only to the amount of punishment in event of his conviction. We discussed a closely-related problem in *Brown v. Commonwealth,* Ky., 551 S.W.2d 557, 559–560 (1977), in which a defendant tried in a bifurcated persistent-offender proceeding asserted the converse proposition that his right to testify in his own behalf during the first stage of the trial would be unconstitutionally diminished by use in the second stage of information elicited from him through cross-examination at the first stage. And our answer here is much the same as it was there. In this state both functions, the finding of guilt and the fixing of punishment, always have been performed by the jury. There is no constitutional requirement that it be otherwise, or that the two be performed by different juries. So, when they are performed by the same jury the defendant simply must weigh the good he can do against the harm he may bring upon himself by electing to testify. As observed in *Brown,* the state's right of cross-examination is a chilling specter for the defendant to contemplate in any criminal case. We doubt, however, that even the Supreme Court of the United States is ready to declare that it violates the 5th Amendment. Needless to say, this court is not.

---

1. In view of *Taylor v. Kentucky,* —— U.S. ——, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), RCr 9.56 was amended as of July 1, 1978, to require inclusion of the presumption of innocence.

2. Also in view of *Taylor v. Kentucky, supra* n.1, RCr 9.56 has been amended to caution against any attempt to define "reasonable doubt."

The right of cross-examination to which a defendant submits himself by testifying in his own behalf exists for the protection of the people at large. It is an indispensable countervailing factor in the adversary system. What the appellant asks us to do here is to trim it down, by confining it to the particular subject on which he chooses to testify. Logically, it would be the same for an accused rapist to insist that he be permitted to testify that he did not steal the victim's purse without submitting himself to questioning as to whether he raped her. The 5th Amendment gives him no such protection. He may not, by selecting the subject upon which he chooses to testify, use his constitutional right of silence to shield him against cross-examination on other subjects that are relevant to the case as a whole.

We agree that under the rationale of *Sherley v. Commonwealth*, Ky., 558 S.W.2d 615 (1977), Whorton's use of a pistol in firing a shot into the ceiling of Jerry's Restaurant did not constitute an offense separate from the 1st-degree robbery charge for which he was being tried and was convicted. Two of the three elements listed by KRS 515.020(1) as elevating robbery to the highest degree are (1) being armed with a deadly weapon or (2) using or threatening to use a dangerous instrument. Though not every "dangerous instrument" is a "deadly weapon," a "deadly weapon" ordinarily is a "dangerous instrument" as well. Hence both of these elements were proved in this case. That is, Whorton could have been found guilty of 1st-degree robbery either on the basis of his having been armed with a deadly weapon or on the basis of his having used or threatened to use that weapon. Neither, however, can be split off from the other and be treated as a separate offense. It was error to submit to the jury the charge of wanton endangerment growing out of the firing of a shot into the ceiling.

We shall not undertake to discuss at length the definition of reasonable doubt offered by Whorton as against the one given by the trial court. The point was noticed by a faint lifting of the skirt in *Taylor v. Kentucky*, —— U.S. ——, 98 S.Ct. 1936, 56 L.Ed. 468 (1978), wherein it was observed that the definition given by the trial court "though perhaps not in itself reversible error, often has been criticized as confusing." It probably is beyond cavil that in the field of law many things are confusing to some, and that some things, among them a good sample of opinions by the United States Supreme Court itself, are confusing to all. We are at a loss to comprehend how a doubt may be considered "reasonable" if it is without substance, and therefore is insubstantial. The definition of "reasonable doubt" that has been approved by this court in recent years was borne of courtroom experience and discussion with jurors who had freshly emerged from the task of wrestling with an intangible concept, and who quite often were disposed to equate the term with "any shadow of a doubt," or with a querulous sense of disappointment that somehow the prosecution had not proved its case to the degree that the jurors could arrive at a verdict without perspiring. Be that as it may, we now throw in the towel. As noted in *Merritt v. Commonwealth*, Ky., 386 S.W.2d 727, 729 (1965), we were never so presumptuous anyway as to believe that where others had failed we might succeed. The long and short of it is that we can no longer approve this definition, but unless and until the highest judicial authority is willing to hold it constitutionally fatal, neither will this court do so. Under the circumstances, we are of the opinion that the jury in this case was sufficiently and properly instructed on the subject.

From time immemorial the emphasis with regard to jury instructions in this state has been placed on simplicity. "The function of instructions in this jurisdiction is only to state what the jury must believe from the evidence (and in a criminal case, beyond a reasonable doubt) in order to return a verdict in favor of the party who bears the burden of proof." *Webster v. Commonwealth*, Ky., 508 S.W.2d 33, 36 (1974). Thus we have sought to avoid ab-

stract legal principles, presumptions,[3] comments on the weight of the evidence, and references to the burden of proof, which is cast by the form of instruction requiring that in order to make an affirmative finding the jury must, on the basis of the evidence, believe certain specified facts to be true. This approach minimizes the possibility of intrusion by the judge into that particular area of decisionmaking which belongs exclusively to the jury, and it minimizes the possibility of error in that respect. Many lawyers and some judges, including the writer of this opinion, abhor the system that prevails in the federal trial courts, where at the close of the evidence the judge assumes the pulpit and turns preacher, droning out sweaty reams of boilerplate that few jurors really could be expected to digest.

Any thought that our form of instructions might have been designed for the simple-minded would be absurd. Its philosophy is to keep the jury strictly in its place, to keep the judge strictly in his place, to facilitate uniformity, to minimize error, and to avoid prolixity.

To abdicate this wholesome philosophy and flee to the soporific style of the federal courts for the mere sake of taking a step toward nationwide homogeneity would be regrettable. If there is to be a uniform system for the country, better might we entertain the hope that some consideration be given to the proposition that ours may be the preferable choice. Although the Supreme Court's reference to the instructions in *Taylor* as "skeletal" and "Spartan" may not have been so intended, it was more of a compliment than a slur. Indeed, we ourselves have said that instructions ought to provide "only the bare bones." *Cox v. Cooper*, Ky., 510 S.W.2d 530, 535 (1974). To suggest that they are undernourished simply because they so appear in comparison with the bloated and cumbersome instructions customarily given in the federal courts is nothing less than a symptom of myopia.

In *Taylor* a judgment of the Franklin Circuit Court was reversed because the trial court declined to instruct the jury that the law presumes a defendant innocent—and this despite the fact that on *voir dire* the jurors had already signified that they understood that proposition! If the trial court's "truncated discussion of reasonable doubt . . . was hardly a model of clarity," as remarked in *Taylor*, we must confess that we have a similar difficulty with the *Taylor* opinion itself.

The dissenting members of our court feel that the holding in *Taylor* is confined to the facts of the case. They draw that inference from the next-to-last sentence of the opinion (emphasis added): "We hold that *on the facts of this case*[4] the trial court's refusal to give petitioner's requested instruction in the presumption of innocence resulted in a violation of his right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment."

Admittedly, the weight of evidence against Whorton was far greater than it was against the defendant in *Taylor.* But does the Supreme Court actually mean to suggest that a defendant's right to the instruction can be made, ultimately, to stand or fall on the weight of the evidence in a given case? If so, then every case in which the trial court refused to give it will have to be decided according to the Chapman-Harrington harmless-error test. If that was the intention, it would have been considerate of the court to say so. It may be that the question of harmless error was not argued in that case, but "a model of clarity" would have left a clean cut rather than a jagged stump. After all, it might reasonably have been foreseen that this court would have to apply the decision to a goodly number of other cases then in the process of appeal in this state, Whorton's being but one of them.

Those of us in the majority would like to be able to hold that this newly-declared

---

3. See *Mason v. Commonwealth*, Ky., 565 S.W.2d 140 (1978), in which future reference to the presumption of sanity was proscribed.

4. On what other facts an appellate court might rest its decision we hesitate to guess.

constitutional requirement is subject to the harmless-error rule, but we are afraid it might not stick. We know very well that in actuality Taylor was no more "prejudiced" in his case than Whorton was in this one. Yet *Taylor* contains no hint that it might have been appropriate to consider whether the error was in fact prejudicial. To bring this discussion to a merciful end, we read *Taylor* to mean that when an instruction on the presumption of innocence is asked for and denied there is a reversible error. If it means something short of that, we shall welcome further enlightenment from the only source that seems to be able either to construe or to amend the Constitution.

The judgment is reversed with directions for a new trial.

All concur except for CLAYTON and STEPHENSON, JJ., who dissent.

LUKOWSKY, Justice, concurring.

I concur with my brothers in the result we reach in this case. However, it seems to me that this case provides a forum in which we should articulate the paradoxical philosophies with which we are besieged and propose a course of action to minimize the problems which they create.

In the field of criminal procedure we have observed a decisional process by the Supreme Court of the United States which has crushed the status of the several states as "insulated chambers" of legal experimentation.[1] The fuel which has fed this juggernaut is the concept that the due process clause of the Fourteenth Amendment of the Constitution of the United States makes the First, Fourth, Fifth, Sixth and Eighth Amendments of that document binding upon the several states.

The purpose of this discussion is not to ascertain whether this fuel is historically distilled[2] or artificially synthesized.[3] Rather it is to examine the path made by the steamroller and determine how it may be traveled most smoothly.

Most of the path in Kentucky was free of obstacles because the federal constitutional rules imposed by these decisions were in force here as matters of state law long prior to their enunciation by the Supreme Court of the United States.[4] However, as the Supreme Court continues its journey it digs deeper in the terrain of state procedure, destroys traditional state prerogatives[5] and causes adjustments to be made

1. *Traux v. Corrigan*, 257 U.S. 312, 344, 42 S.Ct. 124, 134, 66 L.Ed. 254, 268 (Holmes, J., dissenting) (1921).

2. The historical validity of this rationale is supported by Hutchinson, The Foundations of the Constitution (1975) and Gora, Due Process of Law (1977).

3. The historical validity of this rationale is undermined by Meyer, The History and Meaning of the Fourteenth Amendment, Judicial Erosion of the Constitution Through the Misuse of the Fourteenth Amendment (1977) and Berger, Government by Judiciary, the Transformation of the Fourteenth Amendment (1977).

4. *Compare: Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) *with Youman v. Commonwealth*, 189 Ky. 152, 224 S.W. 860 (1920) *(suppression of evidence illegally obtained); Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) *with Turner v. Commonwealth*, 89 Ky. (7 Bush) 78, 81, 1 S.W. 475, 476 (1886) and *Holland v. Commonwealth*, 241 Ky. 813, 45 S.W.2d 476, 477 (1932) (indigent's right to appointed counsel in serious criminal cases); *Duncan v. Louisiana*, 391 U.S.

145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) *with* Constitution of Kentucky Sec. 11 (1891) (right to trial by jury); *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978) *with* Constitution of Kentucky Sec. 248 (1891) (permissible size of juries); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) *with* KRS 422.110(2) (1942) (method of determination of admissibility of confessions); *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) *with* KRS 510.040(2) and 532.030 (1975) (imposition of the death penalty for rape).

5. *See, e. g., In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (constitutionalization of juvenile procedures); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Roberts v. Louisiana*, 428 U.S 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (procedure for invoking death penalty); *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (right to counsel at preliminary hearing); *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976) (guilty plea procedure); *Chambers v.*

which are of uncalculated impact. The court has also chosen to examine but has refrained so far from disturbing other state procedural devices.[6] It is fair to say that this process has nationalized criminal procedure,[7] even though there are those who would dispute this conclusion.[8] The course of the Burger court is not significantly different from that of the Warren court, except that it has limited the use of federal habeas corpus as a method of enforcing these newly promulgated constitutional rights.[9]

State systems of criminal procedure are like delicate Swiss watches. They are designed to equally balance the rights of the parties. When the balance is externally disturbed the shockwave requires a reevaluation and readjustment of the entire system.

*Taylor v. Kentucky,* —— U.S. ——, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), provides a perfect example. The case in effect establishes the principle that the due process clause of the Fourteenth Amendment requires a state trial judge to instruct the jury on the presumption of innocence when requested by a criminal defendant. The system of instructing juries developed in Kentucky prohibits instructions on presumptions and permissible inferences. The theory is that to avoid undue influence by the trial judge on the fact finding process

for or against either party the instructions should simply focus the attention of the jury on those ultimate facts which it must decide in order to reach a verdict. Consequently, the instructions are skeletal in form, given prior to closing argument and leave to the lawyers the task of fleshing them out in closing argument insofar as the evidentiary facts of the case, the weight of the evidence and the credibility of the witnesses are concerned.

This rule was a two-edged sword and cut equally for and against both sides of the case. For example, we recently held that the Commonwealth was not entitled to an instruction on either the presumption of sanity or the presumption of knowledge which arises from the possession of recently stolen goods. *Mason v. Commonwealth,* Ky., 565 S.W.2d 140 (1978); *Wells v. Commonwealth,* Ky., 561 S.W.2d 85 (1978). Obviously, *Taylor, supra,* requires the restoration of balance to the rights of the parties. No thought was given to this aspect of the problem by those who mandated the change because they were neither conversant with the operation of the system, nor responsible for its maintenance.

A trial is no more than a search for the truth. The method by which that search is conducted is of little import so long as it is rational, fair to all parties and civilized.

*Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (evidentiary rules); *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) (indigents not subject to imprisonment for non-payment of a fine); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593, (1975) (closing argument at trial required); *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (notice of alibi rule requires reciprocal discovery).

**6.** *See, e. g., Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (jury sentencing permissible); *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (bifurcated trial not required); *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of a confession may be determined by the trial judge on a preponderance of the evidence standard and need not be redetermined by the jury); *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Apodaca v. Oregon,* 406 U.S. 404,

92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (unanimous verdict not required); *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (juveniles have no right to a jury in a delinquency trial).

**7.** *E. g.,* Pye, The Warren Court and Criminal Procedure, 67 Mich.L.Rev. 249 (1968); Meador, Are We Heading for a Merger of Federal and State Courts?, 17 The Judges' Journal, No. 2, 9 (1978).

**8.** *E. g.,* Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929 (1965); Burger, To Weaken Our State Courts Is to Destroy Federalism, 17 The Judges' Journal, No. 2, 10 (1978).

**9.** *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

The concept of a national mode of criminal procedure is not too unpalatable to be swallowed in America a century after the Civil War. The Supreme Court of the United States has made it clear that it will no longer pay homage to "federalism" by permitting the states to experiment with an ever lengthening list of new found "fundamental" rights of defendants in criminal cases.[10]

We should abandon the obsolete fortresses of local criminal procedure. Their unique character may be matters of pride, but their use does not so improve the search for the truth as to justify the time and energy lost in their defense. The litigation they spawn diffuses our efforts to apply, develop, and interpret substantive law and subordinates the question of guilt or innocence to the justification for the retention of local practices.

I would end the conflict and equalize the position of the parties now by:

1. Amending our Rules of Criminal Procedure to conform as closely as possible with the Federal Rules of Criminal Procedure including:

(a) Permitting the trial judge to charge the jury orally after closing argument and to comment on the weight of the evidence and the credibility of the witnesses.[11] *Contra*, RCr 9.54(1).

(b) Abandoning the rule that a conviction may not be based on the uncorroborated testimony of an accomplice. *Contra*, RCr 9.62.

(c) Requiring the trial judge to fix all penalties other than death upon conviction. *Contra*, RCr 9.84.

(2) Adopting the Federal Rules of Evidence in toto, at least for use in criminal cases.[12]

This approach would insure that if the Supreme Court of the United States should reverse a Kentucky case on procedural grounds it would have to dine on a procedure, which it prepared and we could take comfort in the lament of the homemaker that the dullest food is that which you cook yourself.

REED, Justice, concurring.

I join the majority opinion to the extent it holds that the only reversible errors presented were the trial judge's refusal to comply with the submitted request of the appellant for an instruction on the "presumption" (more properly, assumption) of innocence, and his submission to the jury of the charge of wanton endangerment growing out of the firing of a shot into the ceiling despite appellant's objection that the submission constituted an impermissible multiplicity. I do not, however, agree with some of the observations made in the majority opinion, although I do thoroughly agree with other statements made therein.

10. *Compare Crist v. Bretz*, —— U.S. ——, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) *with Graham v. Commonwealth*, Ky., 562 S.W.2d 625 (1978) *and Cross v. Commonwealth*, 270 Ky. 537, 109 S.W.2d 1214 (1937) (when jeopardy attaches).

11. This change has been advocated in civil as well as criminal cases on state constitutional grounds. Lukowsky, The Constitutional Right of Litigants to Have the State Trial Judge Comment Upon the Evidence, 55 Ky.L.J. 121 (1966); Hoyt, the Judge's Power to Comment on the Testimony in his Charge to the Jury, 11 Marq. L.Rev. 67 (1927); Shelton, Is the Common-Law Relation of Judge and Jury Subject to Legislative Change?, 3 Va.L.Rev. 275 (1916). There are those who maintain that this should not be permitted because state trial judges are not as able as their federal counterparts. It must be remembered that federal judges are "appoint-

ed" not "annointed." There is no valid reason why the political accident that a man is a federal rather than a state judge should make him more competent, or conscientious, or learned than his opposite number in the state courthouse. *Stone v. Powell, supra*, 428 U.S. at 474 n. 6, 493 n. 35, 96 S.Ct. at 3043 n. 6, 3052 n. 35, 49 L.Ed.2d at 1076 n. 6, 1087 n. 35. Three of the six United States district judges presently sitting in Kentucky were appointed to their posts while they were sitting as judges of the Circuit Court of Kentucky. This method of instructing juries is in satisfactory use in fourteen states. *Lukowsky, supra*, at 125 n. 12.

12. *Compare Chambers v. Mississippi, supra* n. 5 *with Crawley v. Commonwealth*, Ky., 568 S.W.2d 927 (1978).

When the trial judge refused to instruct on the "presumption" of innocence, he followed the settled law of this state. That law redounded to the benefit of criminal defendants in many instances where an evidentiary presumption favored the prosecution's case. If the Kentucky system of jury instructions in criminal cases is now to become one where "presumptions" favorable to defendants must be given but there shall be no instructions on "presumptions" favorable to the prosecution, then the entire procedure is way out of balance and the interests of society to protect the innocent victims of crime and to punish and to prevent the repetition of dangerous and sometimes fatal criminal activity are critically denigrated.

I am in substantial agreement with most of what is said in my brother Lukowsky's concurring opinion. I am persuaded, however, that the United States Supreme Court is not the only agency seeking to impose a gray blanket of national uniformity on the court systems of the several states. So-called national "standards," "guidelines" and "goals" are poured forth without much, if any, consideration given to the experience, record and workability of individual state systems, more particularly those not represented on the frequently formed "conferences," "committees," "commissions," "sections," and "task forces," which with boring frequency are usually composed of the same people who apparently nominate each other for inclusion in the proliferating projects. It taxes one's credulity to conclude that these individuals possess expertise in so many diverse areas.

I do not share the asperity of the majority concerning the federal trial method. After all, it has delivered a good and acceptable product of justice in Great Britain for a long time and fourteen states of the Union are using it with results satisfactory to them. I disagree with my brother Lukowsky that it is either necessary or desirable for a trial judge to comment on the credibil-

ity of witnesses or for us to swallow indiscriminately the complete Federal Code of Evidence to assure federal acceptance of our system's results or to provide a fairer system than we have.

My present uneasiness about our jury instruction methods is that they are too complicated rather than too "sparse" or "truncated." I would prefer letting a trial judge explain in concise layman's language, in all places possible, what a jury's function is and to relate it to the particular case on trial. I would recommend that this procedure be used by the judge at the commencement of trial and after final arguments have been completed. This procedure basically is nothing more than an adaptation and extension of the interrogatories to the jury provisions we already have in our procedural rules for civil cases.

CLAYTON, Justice, dissenting.

I believe that the result in *Taylor v. Kentucky*, —— U.S. ——, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), was meant to, and that it should, be limited to factual situations similar to the one in that case, and I am greatly surprised and disappointed that the majority of my brothers do not agree.

It should be noted from the outset that although I too resent the *Taylor* decision because it represents yet another encroachment by the United States Supreme Court upon the once hallowed ground of state procedural law, I hardly see how we can take offense at the principle espoused therein. The notion that a man is presumed innocent until proven guilty is every bit as firmly embedded in the criminal law of Kentucky as in its federal counterpart, and in light of the recent revelation that over a third of all Americans believe it is the responsibility of the accused to prove his or her innocence,* it might be a good idea to remind jurors of this fundamental rule.

Whether an instruction on the presumption of innocence should be given whenever requested, however, is not the question be-

---

* According to a comprehensive national survey conducted by the National Center for State Courts, the actual figure is 37%. *See* Law-

scope: State Courts Seeking to Draw Blueprint for the Future, 64 *A.B.A. Journal* 653 (May 1978).

fore us. Rather, the question which must be answered is whether the failure to do so automatically constitutes reversible error in every case. Those who join in the majority today answer this query in the affirmative, alleging that they would like to be able to hold the requirement enunciated in *Taylor* subject to the harmless-error doctrine, but asserting that they cannot because "*Taylor* contains no hint that it might [be] appropriate to consider whether [a failure to instruct on the presumption] was in fact prejudicial." Apparently their hearts were not really in it when they embarked upon the hunt.

Not once, but three times the clue the majority says it is searching for appears in the *Taylor* opinion, the Supreme Court initially referring to the "cumulative effect of the potentially damaging *circumstances of this case*," and the "particular need for such an instruction *in this case*" and concluding by stating that "[w]e hold that *on the facts of this case* the trial court's refusal to give petitioner's requested instruction on the presumption of innocence resulted in a violation of his right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment." —— U.S. at —— n. 15, ——, and ——, 98 S.Ct. at 1937 (emphasis added). I submit that it is apparent from these passages that the Supreme Court fully intended to limit *Taylor* to its facts. Although certainly not determinative of the issue, this position is hardly undermined by the comment of the dissenters in *Taylor* that "[i]n some cases the omission [of an instruction on the presumption of innocence] may be fatal, but the court wisely avoids holding that this is always so." —— U.S. at ——, 98 S.Ct. at 1938 (Stevens, J., dissenting).

Far more important than the appearance of those specific passages, however, is the thrust of the *Taylor* decision as a whole. As I read the majority opinion in that case, there are three significant points to be derived therefrom: first, that instructions on the presumption of innocence and reasonable doubt do not necessarily perform the same function—although both instructions inform the jury *who* has the burden of establishing guilt (the prosecution), the in-

struction on the presumption of innocence tells the jury *how* that guilt must be proven (by legal evidence only), while the instruction on reasonable doubt tells the jury *how much* proof is required; secondly, that the crucial question in determining whether there is any "purging" function to be performed by an instruction on the presumption is whether there exists "a genuine danger that the jury [might] convict [the accused] on the basis of those extraneous considerations, rather than on the evidence introduced at trial," —— U.S. at ——, 98 S.Ct. at 1936—in *Taylor* the extraneous circumstances cited as creating a need for this purging effect were the prosecutor's reading of the indictment to the jury and his remarks during summation implying that the mere fact Taylor had been charged with a crime was evidence of his guilt; and finally, and most importantly for our purposes, that in answering the preceding question, the level of danger can be affected by the weight of the evidence for or against the accused—in *Taylor* the court specifically found that the risk was "heightened because the trial was essentially a swearing contest between [the] victim and [the] accused." *Id.*

If the danger that the jury might convict the accused on the basis of extraneous matters is increased where the case is close on the evidence, surely that danger must be decreased where the evidence against the accused is overwhelming in relation to the evidence in his favor. In the case at hand, the indictment against Whorton was read into the record in the presence of the jury unaccompanied by an admonition that it was not to be considered as evidence. Immediately thereafter, there followed a parade of fifteen eyewitnesses who positively identified Whorton as the perpetrator of the crimes charged therein. Under these circumstances, I simply cannot believe there is any real possibility that the reading of the indictment could have affected either the jury's determination of guilt or punishment.

In closing I wish to emphasize that I do not believe that either *Taylor* or the decision reached by the majority today disturbs the time-honored and salutary rule in this

jurisdiction prohibiting instructions on presumptions and inferences. For as pointed out in *Taylor* itself, the presumption of innocence, unlike the presumption of knowledge from possession of recently stolen goods, for example, is not really a true "presumption"—i. e., a mandatory inference drawn from a fact in evidence—at all, but is rather merely an "assumption" to be indulged in the absence of evidence to the contrary. —— U.S. at —— n. 12, 98 S.Ct. 1930.

I would affirm each of Whorton's convictions except that involving wanton endangerment, which I agree is reversible on double jeopardy grounds.

STEPHENSON, Justice, dissenting.

I agree with the majority opinion to the extent of the holding that Whorton's use of a pistol in firing a shot into the ceiling of Jerry's Restaurant did not constitute a separate offense from the first-degree robbery charge. In all other respects I dissent.

The majority opinion oversimplifies my dissent. A careful reading of *Taylor* demonstrates to me that the failure to give a presumption of innocence instruction was held reversible error, primarily for the reason stated in *Taylor* that there was a risk that the jury would convict on the basis of the extraneous considerations mentioned in *Taylor* and "That risk was heightened because the trial essentially was a swearing contest between victim and accused." *Taylor* went on to state "the particular need for such an instruction in this case."

It is my view that with the equivocal language in *Taylor* the simple solution in this case is to apply the *Chapman-Harrington* test. Here we have three witnesses who identified Whorton in the robbery of the Doughnut Shop, two witnesses who identified Whorton in the robbery of the Burger Chef, ten witnesses who identified Whorton in the robbery of Jerry's and the arresting officers on the charge of wanton endangerment. The only defense offered at all was the testimony of Whorton's wife and sister who offered alibi testimony for the robbery of the Doughnut Shop. With Whorton not testifying we have a case for the prosecution that passes overwhelming evidence of guilt and reaches conclusive evidence of guilt. I do not believe that any thoughtful person would say that the failure to give a "presumption of innocence" instruction constituted unfair prejudice to Whorton. There can be no doubt at all that a conviction would have resulted if the instruction had been given; so, it follows that the error was harmless beyond a reasonable doubt, the basis of the *Chapman-Harrington* test.

*Taylor* does not pretend to hold that the constitutional right to a "presumption of innocence" instruction is so absolute that failure to give the instruction is reversible in all cases. It is my opinion that *Taylor* should be applied on a case by case basis depending on the circumstances in the particular case, and I am willing to handle the problem in this fashion rather than the rigid rule enunciated in the majority opinion which goes beyond the requirements of *Taylor*.