## Commonwealth v. Palmer

*Joseph H. Kleinfelter,* assistant district attorney, for the Commonwealth.
*Joseph J. Huss, III,* for defendant.

DOWLING, *J.,* April 16, 1984—
THE COURT: Ladies and gentlemen, have you agreed upon a verdict?
THE FORELADY: Yes—we find the defendant guilty.
COUNSEL: We would request a poll.
THE COURT: How do you find the defendant, Juror No. 1?

JUROR NO. 1: Guilty.

THE COURT: Juror No. 2?

JUROR NO. 2: Guilty.

THE COURT: Juror No. 3?

JUROR NO. 3: Guilty.

THE COURT: Juror No. 4?

JUROR NO. 4: Guilty.

THE COURT: Juror No. 5?

JUROR NO. 5: Guilty.

THE COURT: Juror No. 6?

JUROR NO. 6: Guilty.

THE COURT: Juror No. 7?

JUROR NO. 7: Guilty.

THE COURT: Juror No. 8?

JUROR NO. 8: Guilty.

THE COURT: Juror No. 9?

JUROR NO. 9: Guilty.

THE COURT: Juror No. 10?

JUROR NO. 10: Guilty.

THE COURT: Juror No. 11?

JUROR NO. 11: Guilty.

THE COURT: Juror No. 12?

JUROR NO. 12: Innocent.

THE COURT: Innocent. Twelve of you have to agree.

JUROR NO. 12: We discussed it upstairs. I had to change my vote.

THE COURT: The verdict has to be unanimous.

JUROR NO. 12: It was. I had to change my vote. I mean, we never came to no conclusion and we was up there bickering back and forth and the situation has been discussed to me at different angles, so I had switched my vote.

THE COURT: The verdict has to be unanimous. The forelady signed it. I assume at the time that you took the verdict, it was. Now, what is your verdict now? Guilty or not guilty?

JUROR NO. 12: Guilty, Your Honor.

THE COURT: He now says he was guilty. So, we will accept it as guilty.

---

At the time of the founding of these United States, a jury trial in criminal cases had been in existence in England for at least 200 years and carried impressive credentials traced by some to Magna Carta[1] and came to America with English colonists receiving strong support from them. Royal interference with the jury trial was deeply resented. One of the resolutions adopted by the First Congress of the American Colonies in 1765 was the declaration that, "Trial by jury is the inherent and invaluable right of every British subject in these Colonies." The First Continental Congress in 1774, objecting to trials before judges dependent upon the Crown for their salaries and to trials in England for crimes allegedly committed in the Colonies declared:

"That the respective Colonies are entitled to the Common Law of England, and more specially, to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law."

The Declaration of Independence set forth the same objections. The Constitution itself commands:

"The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes have been committed." Article III, Section 2.

And the Sixth Amendment, among other things, provides:

---

1. Though this origin is questioned by Pollock and Maitland, The History of English Law Before the Time of Edward I (2d ed. 1909).

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed."

The Constitutions adopted by the original States guaranteed jury trials, and the Constitution of every State entering the Union thereafter, in one form or another, protected the right to trial by jury in criminal cases.

But this is not to say that the concept of a criminal jury trial was synonymous with a verdict rendered unanimously by 12 citizens. The history of the development of trial by jury in criminal cases while revealing a long tradition attaching great importance to relying on a body of one's peers to determine guilt or innocence as a safeguard against arbitrary law enforcement affords little insight into considerations that gradually lead the size of the body to be generally fixed at 12. Many theories have been advanced.[2] It has been said that many fanciful reasons for the number 12 have been given and all rest on a little more than mystical or superstitious insights into the significance of "twelve".[3] While sometime in the Fourteenth Century, the size of the jury at

2. See J. Thayer, A Preliminary Treatise on Evidence at the Common Law (1898); A. Scott, Fundamentals of Procedure in Actions at Law (1922); I. W. Holdsworth, A History of English Law (1927).

3. Thus John Proffatt in his treatise on jury trials notes that the reasons why the number of the petit jury is 12, are "quaintly given" in Duncombe's Trials per Pais, as follows: "This number is no less esteemed by our own law than by holy writ. If the twelve apostles on their twelve thrones must try us in our eternal state, good reason hath the law to appoint the number twelve to try us in our temporal. The tribes of Israel were twelve, the patriarchs were twelve, and Solomon's officers were twelve." Trial by Jury 112 n.4 (1877), quoting G. Duncombe, 1 Trials per Pais 92-93 (8th ed. 1766).

common law came to be generally fixed at 12, that particular feature of the system appears to have been a historical accident unrelated to the great purpose which gave rise to the jury in the first place.

In any event, the Supreme Court of the United States in Williams v. Florida, 399 U.S. 78 (1970) held that: "The question in this case then is whether the constitutional guarantee of a trial by "jury" necesarily requires trial by exactly 12 persons, rather than some lesser number — in this case six. We hold that the 12-man panel is not a necessary ingredient of "trial by jury," and that respondent's refusal to impanel more than the six members provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth." In deciding that this accidental feature had not been immutably codified into our Constitution, the court went on to state:

"We do not pretend to be able to divine precisely what the word "jury" imported to the Framers, the First Congress, or the States in 1789. It may well be that the usual expectation was that the jury would consist of 12, and that hence, the most likely conclusion to be drawn is simply that little thought was actually given to the specific question we face today. But there is absolutely no indication in "the intent of the Framers" of an explicit decision to equate the constitutional and common-law characteristics of the jury. Nothing in this history suggests, then that we do violence to the letter of the Constitution by turning to other than purely historical considerations to determine which features of the jury system, as it existed at common law, were preserved in the Constitution. The relevant inquiry, as we see it, must be the function that the particular feature performs and its relation to the purposes of the jury tri-

al. Measured by this standard, the 12-man requirement cannot be regarded as an indispensable component of the Sixth Amendment . . . We conclude, in short, as we began: the fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance "except to mystics'." (p. 98, 99, 102)

Like the requirement of twelve men, the necessity of unanimity apparently arose during the Middle Ages and is likewise shrouded in obscurity. However, toward the latter half of the Fourteenth Century it generally became settled that a verdict had to be unanimous.[4] Interestingly enough, unanimity was not the invariable practice in Seventeenth Century America where majority verdicts were permitted in the Carolinas, Connecticut and Pennsylvania.

In Apodaga v. Oregon, 406 U.S. 404 (1972), the Supreme Court had for consideration an Oregon law based on its Constitution which provided that in other than capital cases, convictions could be sustained as long as ten of the 12 jurors were in accord. The court, after noting that there was considerable doubt as to the assumption that simply because a feature existed in the jury at common law in 1789, that it was necessarily preserved in the Constitution, held that after considering the function the jury performs in contemporary society, unanimity was not constitutionally mandated in criminal cases. In a case handed down the same day, Johnson v. Louisiana, 406 U.S. 356 (1972), the court reached the same conclusion in a case where in accordance with the Louisiana Constitution and statu-

---

4. See I. W. Holdsworth, A History of English Law; Thayer, The Jury and Its Development, 5 Harvard Law Review, 249 (1892).

tory provisions, a defendant was convicted by a nine to three verdict saying:

"We conclude, therefore, that, as to the nine jurors who voted to convict, the State satisfied its burden of proving guilt beyond any reasonable doubt. The remaining question under the Due Process Clause is whether the vote of three jurors for acquittal can be said to impeach the verdict of the other nine and to demonstrate that guilt was not in fact proved beyond such doubt. We hold that it cannot."

In this Commonwealth under the Constitution of 1776, it is provided: "Trial shall be jury as heretofore." The Constitutions of 1790 and 1838 contained identical provisions. The Constitution of 1873, somewhat redundantly, provided, "Trial by jury shall be as heretofore, and the right thereof, remain inviolate." In 1971, this was amended to allow the General Assembly to provide for a verdict by not less than five-sixths of the jury in any civil case.

Unlike the Federal judges, our courts have come to the conclusion although without any real discussion that this means that a jury in a criminal case must consist of twelve persons and the verdict must be unanimous. In Wynkoop v. Cooch, 89 Pa. 450 (1879), the court simply noted that the purpose of the constitutional provision was to preserve the jury trial wherever the common law gave it. This was somewhat expanded in Smith v. Times Publishing Co., et al., 178 Pa. 481 (1897), where the court noted that the phrase "shall be as heretofore" means that it shall be preserved with its substantial elements and then made the sweeping statement that all authorities agree that the substantial features which are to be "as heretofore" are the number twelve and the unanimity of the verdict. In a somewhat later decision, Wellitz v. Thomas, 122 Pa.Super. 438 (1936) the court stated:

"By the sixth section of the Declaration of Rights, it is provided that "trial by jury shall be as heretofore, and the right thereof remain inviolate"; and its meaning is that a jury shall continue to be the tribunal for the determination of all questions of fact in controversies between individuals and in actions and prosecutions brought by the Commonwealth, its substantial feature being that the jury shall consist of twelve good and lawful men, whose verdict must be unanimous: Wynkoop v. Cooch, 89 Pa. 450; Smith v. Times Publishing Co., 178 Pa. 481, 36 A. 296; Com. v. Collins, 268 Pa. 295, 110 A. 738." Having established that our founding fathers will not come down from their pedestals and rend their hair because the defendant is convicted by less than twelve of his peers, but concluding as we must that in this state the courts have generously interpreted the Constitution of our Commonwealth as compelling twelve guilty votes, we return to this case where the inquiry must be whether the scenario set forth above comports with Pennsylvania law.

In Commonwealth v. Watson, 211 Pa.Super. 394, 236 A.2d 567 (1967), the court concluded that a unanimous verdict was not reached based on a colloquy with substantial similarities to the instant one. When polled, a juror replied, "Well, I said not guilty, but I gave in to guilty." It was not until after he had been polled two more times and importuned by the court to come to a final decision, that he agreed to the verdict of guilty. While this situation is not identical to ours, it is important to note that in reversing, the court said, "A juror is not subject to coercion by his fellow jurors, nor should he be by the circumstances attendant at the time of the polling of the jury, when he must disclose publicly his inner thoughts." (p. 397) This was followed a few years later by a case in the Supreme Court,

Commonwealth v. Jackson, 457 Pa. 237 (1974), whereupon being polled the juror responded, " 'He is guilty in one way and I am not sure in another way,' The Court: 'Well, did you join in this verdict?' Juror No. 1: 'Guilty.' " (p. 240) The Supreme Court, after first erroneously stating that a unanimous verdict was protected by the Federal Constitution (see above discussion) concluded that where an evasive answer of a juror leaves doubt as to whether he has assented to the verdict, but his answers indicate neither involuntariness or coercion, a subsequent answer or further interrogation which indicates clear and unequivocal assent will cure any possible defect.

Commonwealth v. Hall was a situation where the juror was polled and answered, "Not guilty." and immediately replied, "I made a mistake." And when being asked again, replied, "Guilty." In refusing a new trial, the court stated that a juror's initial ambiguous, inconsistent or evasive answer does not vitiate unanimity as long as he later clearly agrees.

And, finally, in Commonwealth v. Stufflet, 276 Pa.Super. 120, 419 A.2d 124, (1980), defendant was tried on charges of indecent assault and attempted rape, and a juror affirmed a guilty verdict as to attempted rape but not guilty on indecent assault. A subsequent colloquy indicated that she found the defendant guilty of both charges. The court reversed the conviction, holding that the subsequent colloquy did not cure the defect.

In essence, the rule of law to be derived from these decisions seems to be that if a juror's response is inconsistent, ambiguous, equivocal, or evasive, it may be cured by a subsequent unequivocal answer, but if, however, the initial response is unambiguous and unmistaken and is changed after further inquiry this is not sufficient, particularly where as is

here there is indication that the juror felt he was being coerced in the jury room.

Though while 11 said guilty, defendant is saved by the bell, at least until the next round.

Accordingly, we enter the following

### ORDER

And now, April 16, 1984, defendant's motion for a new trial is granted.