Thomas **BRADLEY**, Mayor, City of Los Angeles, et al., Plaintiffs and Petitioners,

v.

**JUDGES OF the SUPERIOR COURT FOR the COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,** as a class, represented by Alfred J. McCourtney, Jr., presiding Judge, Defendants and Respondents,

William A. Goodwin, Jury Commissioner of the Superior Court, Los Angeles County, Defendant,

Peter J. Pitchess, Sheriff of Los Angeles County, California, Respondent,

Jacob Gunn, Warden, Folsom Prison, Respondent,

James Garner, acting Warden, Deuel Vocational Institution, Respondent,

Percy Lawrence Tolton et al., Intervenors.

Civ. No. 73–408–WPG.

United States District Court, C. D. California.

Feb. 25, 1974.

**28**

Thomas G. Neusom, Richard S. Buckley, Public Defender, G. Keith Wisot, Deputy Public Defender, Los Angeles, Cal., for plaintiffs and petitioners.

John D. Maharg, County Counsel, Los Angeles, Cal., for defendants and respondents.

Robert F. Katz, Deputy Atty. Gen., Los Angeles, Cal., for respondents.

Harold Tamkin, Los Angeles, Cal., for intervenor-plaintiff-petitioner Percy Lawrence Tolton.

Patrick J. Sampson, La Verne, Cal., for intervenor-plaintiff-petitioner Bozzie B. Burton III.

Nancy Kelso, Santa Monica, Cal., for intervenor-plaintiff-petitioner Maurice Gilford Moore.

Howard J. Rubinroit, Los Angeles, Cal., for intervenor-plaintiff-petitioner Earl Jerry Butler.

Donald B. Black, Joseph H. Cummins, Fred Okrand, Tom Stanley, Stanley S. Delnick, Los Angeles, Cal., Langston Law Club, Santa Monica, Cal., Burton Marks, Beverly Hills, Cal., amicus curiae.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM P. GRAY, District Judge.

This action seeks to challenge the current method of selecting prospective jurors for service in the departments of the Los Angeles County Superior Court that are located in the Central District of the county. One group of plaintiffs (including the mayor of the City of Los Angeles and other prominent government officials) claims that the challenged system unconstitutionally diminishes their opportunities to serve as jurors, and they seek injunctive relief under the Civil Rights Act of 1871, 42 U.S.C. § 1983. The remaining three plaintiffs (and four intervenors) have been convicted of crimes by juries in the Central District, and they pray for habeas corpus relief from the resulting imprisonment. For reasons hereinafter set forth, the civil rights action is dismissed and the petitions for habeas corpus are denied.

*The Facts.* Because of its large geographic size and population, Los Angeles County for several years has been divided into nine judicial districts, in each of which departments of the Superior Court are located. One of these is the Central District, which, as its name implies, contains the principal commercial and financial area of the City and County of Los Angeles, as well as the seats of their respective governments, including, of course, the main county courthouse.

For several years prior to December 23, 1969, prospective jurors for Superior Court trials in districts other than the Central District were selected, on a computerized random basis, from among residents of the respective districts. By contrast, prospective jurors for the Central District were obtained through a county-wide draw.[1]

On December 23, 1969, the then Presiding Judge of the Los Angeles County Superior Court issued an order that jurors for the Central District were to be drawn only from that district. This order was given effect for about eighteen months, or until July 6, 1971, when it was terminated, and the county-wide draw for jurors in the Central District was resumed.

Because of the proportionately large numbers of black residents and residents

---

1. Such a system is in harmony with section 206 of the California Code of Civil Procedure, which provides, in effect, that persons whose names are selected from a particular district shall not " . . . serve as trial jurors for any other part of the county, other than in the county seat."

of Mexican-American extraction living in particular areas of the Central District, the racial composition of juries serving in that district is substantially different when they are composed of local residents as compared with a county-wide draw. This is illustrated by the following table:

| | District Draw | | County-wide Draw | |
|---|---|---|---|---|
| Blacks: | | | | |
| Residents of Central District | 32% | | 3% | |
| Non-residents of Central District | 0 | | 5 | |
| Total | | 32 | | 8 |
| Mexican-Americans: | | | | |
| Residents of Central District | 18 | | 2 | |
| Non-residents of Central District | 0 | | 5 | |
| Total | | 18 | | 7 |
| Whites and others: | | | | |
| Residents of Central District | 50 | | 6 | |
| Non-residents of Central District | 0 | | 79 | |
| Total | | 50 | | 85 |
| | | 100% | | 100% |

Thus, it appears that the proportion of blacks on the juries in the Central District has been reduced from 32% to 8% as a result of the return to the county-wide draw, and the reduction of Mexican-Americans has been from 18% to 7%.

*The Asserted Justification For Restoration Of The County-Wide Draw.* Both the then Presiding Judge of the Los Angeles County Superior Court and the judge who now holds that position have testified[2] that racial considerations played no part in the 1971 decision to restore the county-wide draw for the Central District, and this court accepts such testimony. The reasons advanced for the change appear to stem from the following:

1. Inasmuch as most of the major law firms have their principal offices in the Central District, most of the major litigation is conducted there. Many of these cases involve matters of county-wide interest and concern.

2. Because of the much greater facilities at the main courthouse and the larger number of judges available there, cases involving trials of anticipated long duration are transferred to the Central District, rather than impose strain on the normal operations of the transferring district (however, the recent increase in the numbers of judges in the other districts has diminished substantially the need for such transfers).

3. All grand jury indictments are filed in the Central District and the trials resulting therefrom are held there.

4. About 20% of the total population of the county lives in the Central District; by contrast, because of the above listed factors, about 60% of the county's jury trials, including 50% of all criminal trials, are held in that district. A local draw would put a disproportionate amount of the burden of jury duty upon the residents of the Central District.

2. Such testimony was in the course of state proceedings related to the issues here concerned. *See* Adams v. Superior Court, 27 Cal.App.3d 719, 104 Cal.Rptr. 144 (2d Dist. 1972). The testimony and exhibits in the *Adams* case have been made part of the record here.

5. As Presiding Justice Ford said, in an opinion upholding the challenged system, "The presence in the Central District of a body of jurors selected on a county-wide basis in accordance with the cross-sectional principle assures a defendant whose case is transferred to that district of a jury free from constitutional defects, irrespective of the place in the county at which the crime is claimed to have been committed or of the defendant's place of residence." Adams v. Superior Court, 27 Cal.App.3d 719, 731, 104 Cal.Rptr. 144, 153 (2d Dist. 1972).

6. The present system of county-wide draw for the Central District was in effect for many years. The change in 1969 was made by the then Presiding Judge on his own responsibility, and the Executive Committee of the Superior Court later had some doubt as to the legality of such action.

*The Civil Rights Action.* As has been noted above, under the present system, residents of the Central District are called for jury duty only in that district; but qualified residents of other districts are summoned to serve as jurors in their respective districts *and also* in the Central District. Thus, the latter are likely to be called upon more frequently than are the former. The plaintiffs seeking relief under the Civil Rights Act allege that they reside in the Central District and that the current system unconstitutionally dilutes their rights to serve as jurors in Los Angeles County.

■ It is well established that action by a state in arbitrarily depriving a person of the opportunity to serve on a jury is a violation of a right secured by the United States Constitution and that federal courts have jurisdiction to grant relief under 42 U.S.C. § 1983. Carter v. Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). It is equally clear that such jurisdiction includes the ability to give injunctive relief against state court proceedings. Mitchum v. Foster, 407 U.S. 225, 92 S. Ct. 2151, 32 L.Ed.2d 705 (1972). Nonetheless, I am unable to conclude that this court is obliged to, or should, entertain the present action. Juries are being drawn daily in the courts of the Central District; the injunctive relief requested by the plaintiffs would seriously disrupt the orderly process of pending trial; and the jurisdiction to grant such relief does not foreclose giving careful consideration to the principles of equity and comity that are so important in the relationships between federal and state courts. *See* O'Shea v. Littleton, —— U.S. ——, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

■ Unlike the situation in Carter v. Greene County, *supra*, the state is not systematically excluding the plaintiffs, or anyone else, from jury service. The principal lament of the plaintiffs is simply that they would like to serve more often. This, of course, is commendable. However, insofar as I am aware, the alleged inequity in the present jury system that concerns the plaintiffs has never been brought officially to the attention of the court that adopted it. The matter here concerned is inherently a state problem, involving the manner in which the duties and privileges of jury service should be divided among the local citizens. The judges of the Superior Court share with the plaintiffs a genuine interest in the constant search for ways to improve the administration of justice in Los Angeles County. Principles of comity suggest that they (and the appropriate appellate courts of California) should be given the opportunity to consider the plaintiffs' contentions before this court undertakes to exercise its civil rights jurisdiction. *See* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed. 2d 562 (1959); Kinney v. Lenon, 447 F. 2d 596, 600 (9th Cir. 1971).

Following the command of the last cited authorities, or as a matter of discretion if no such command be inferred under the circumstances, the portion of this action involving the plaintiffs seeking relief under the Civil Rights Act is dismissed.

*The Habeas Corpus Action.* The habeas corpus petitions are a different matter, in that they do not raise considerations of abstention. Under the provisions of 28 U.S.C. § 2254, if a habeas corpus petitioner has not "exhausted the remedies available in the courts of the State, . . ." this court has no jurisdiction. If he has exhausted such remedies, this court is obliged to entertain the application for the writ.

Petitioners Rickey Relaine Adams and Ronald Patrick Patterson have not exhausted their state remedies, in that the appeals from their convictions are still pending. Davidson v. Klinger, 411 F.2d 746 (9th Cir. 1969). Petitioner Leslie Howard Rooks and intervenors Percy Lawrence Tolton, Bozzie B. Burton III, Maurice Gilford Moore and Earl Jerry Butler, allege that they raised the present jury selection issue in their respective trials in the Central District, in the resulting appeal, and in their unsuccessful petitions for hearing in the California Supreme Court. They have exhausted their state remedies, and this court must therefore consider their applications on the merits, which it now proceeds to do.

The fact that the petitioners were convicted by juries selected by means of a county-wide draw does not raise a valid "due process" issue. The Sixth Amendment to the United States Constitution provides that a defendant in a criminal case is entitled to a trial ". . . by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." The statutes of California long have provided that a person accused of a felony shall be tried in the *county* within which the offense was allegedly committed. California Penal Code §§ 691 and 777. Thus, the petitioners cannot be heard to make a "due process" complaint concerning the county-wide area from which the jurors were drawn. Nor are they in position to make such a challenge as to the racial compositions of their respective juries (apart from the fact that we

do not know precisely what they were). Federal constitutional rights are satisfied so long as the source of the jury lists ". . . reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty." Brown v. Allen, 344 U.S. 443, 474, 73 S. Ct. 397, 416, 97 L.Ed. 469 (1953).

The petitioners do not seriously challenge the constitutionality of the system of county-wide draw for jurors, in itself. Their contention is well expressed by Justice Cobey in his dissenting opinion in Adams v. Superior Court, 27 Cal.App. 3d 719, 735–736, 104 Cal.Rptr. 144 (1972):

> "It seems clear to me that Rickey Adams' constitutional right to a jury trial is directly affected by the dual system of selecting prospective trial jurors in criminal cases in the Los Angeles County Superior Court. Since he is to be tried in the Central District his prospective jurors will be drawn countywide, but one tried for precisely the same crimes in another district would be tried by a jury drawn exclusively from residents of that particular district. The constitutional right of a defendant in a criminal case to trial by jury includes trial by a proper jury. (See Glasser v. United States (1942) 315 U.S. 60, 85, 62 S.Ct. 457, 86 L.Ed. 680, 707.) Similarly situated defendants in criminal cases in Los Angeles County are constitutionally entitled to be tried by juries selected on the same basis. Otherwise the concept of constitutional equal protection of the laws that 'persons similarly situated with respect to the legitimate purpose of the law receive like treatment' (see Purdy & Fitzpatrick v. State of California (1969) 71 Cal. 2d 566, 578, 79 Cal.Rptr. 77, 85, 456 P.2d 645, 653 [38 A.L.R.3d 1194]), is violated."

The Supreme Court's most recent landmark decision concerning the equal protection clause is San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), which was rendered after *Adams*

was published. The opinion in *Rodriguez* established a framework to be used in determining whether a legislative scheme constitutes a denial of equal protection. It must first be determined whether the accused system discriminates against a "suspect" class (that is, one that has been a traditional or frequent victim of discrimination, or politically powerless) or "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." 411 U.S. at 17, 93 S.Ct. at 1288, 36 L.Ed.2d at 33. If so, it must be held constitutionally deficient unless it serves a "compelling state interest." If the system is not directed against a suspect class and does not impinge upon a fundamental constitutional right, it must be upheld if "it rationally furthers some legitimate, articulated state purpose." 411 U.S. at 17, 93 S.Ct. at 1288, 36 L.Ed.2d at 33.

Operating within the framework prescribed by *Rodriguez*, we must first undertake to identify the victims of the alleged discrimination. We start with the obvious fact that the affected class consists of all defendants in criminal jury trials in the Central District of the Los Angeles County Superior Court. This includes residents and non-residents of that district, rich and poor, and people of all races and cultures. On initial examination, the specter of invidious discrimination is not obvious.

Members of minority races, as such, are not discriminated against; the racial composition of a jury in the Central District, under the county-wide draw, is likely to be generally comparable to what it would be in any of the other districts. Thus a defendant whose skin is black or brown is hardly likely to find less racial affinity among the jurors in the Central District than elsewhere.

Unlike the present petitioners, many defendants tried in the Central District do not live there. Such non-residents would have no reason to expect to be tried exclusively by their own "neighbors," any more than they would if they had found themselves being prosecuted in any other district away from home.

It is true that in such other districts they would be tried by the "local" people, as compared with county-wide residents. But this distinction, in itself, would hardly be a matter of significant concern, apart from the factor of race, which is completely fortuitous insofar as non-residents are concerned (and which is considered below with respect to resident defendants).

Thus the designation of the victim class would seem to focus upon defendants that are *residents* of the Central District, whether they be black, brown, white or of oriental extraction; unlike other defendants who are tried in districts where they reside, their cases are not heard exclusively by jurors who live in that same area. It is self evident that the *residence* of a defendant in a criminal case, be it the Central District of Los Angeles County or any comparable area, has not been a substantial factor in past discrimination. It would therefore appear that the element of a "suspect" class, which is the first test in detecting unconstitutional violation of equal protection, according to *Rodriguez*, is lacking.

However, the petitioners contend that the suspect class consists of defendants that are residents of the Central District *and* are members of minority races that have been traditional victims of discrimination, namely, blacks and people of Mexican heritage. They insist that these racially identified defendants are again discriminated against because, as has been noted above, the county-wide draw reduces substantially the numbers of such minorities serving on Central District juries.

This court has been much troubled by such an argument. Before undertaking to resolve it, I have sought carefully to explore the applicability here of the obvious fallacy in the assertion, advanced long ago, that there was nothing discriminatory in an English statute that made it unlawful for any person to sleep under a bridge, because the prohibition applied to the rich and poor alike; I have pondered the awareness that some

of the worst manifestations of discrimination are the most subtle; and I have tried to give all appropriate consideration to my deeply held aversion to racial discrimination in all of its forms. Despite these considerations, I am impelled to reject the petitioners' contention. It implies that a defendant in a criminal case gets a "better shake" in direct proportion to the number of members of his own race that are on the jury.[3]

Before considering the constitutional aspects, I cannot resist making the observation that my own experience, as a judge, with multi-racial juries belies the petitioners' contention. Most of the juries have been unanimous in their findings as to the facts, irrespective of their racial compositions and irrespective of the races of the respective defendants; and in the occasional instances in which the juries have been unable to reach a verdict, none of such disagreements have permitted any inference that they stemmed from ethnic considerations. The petitioners' inherent implication to the contrary does injustice to the countywide citizens of all races that presently serve on Central District juries and to the local residents that the petitioners would like to substitute in their stead.

■ The upholding of the petitioners' argument would mean that, under the equal protection clause, each defendant in a criminal case would be entitled to a jury containing the same number of members of his own race as would be accorded any other defendant. Thus, by the same reasoning, a return to local drawing of juries for the Central District would result in unconstitutional discrimination against white defendants be-

cause the proportionate numbers of jurors representing their ethnic class would be decreased in comparison with other districts. It is a practical impossibility to give judicial concern to the ethnic composition of a jury in relation to the race of a particular defendant, and adherence to the Constitution does not require that such an attempt be made.

"All that the Constitution forbids . . . is systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that this race has been systematically excluded. [Citing cases] No group, in short, has the right to block convictions; it has only the right to participate in the overall legal processes by which criminal guilt and innocence are determined." Apodaca v. Oregon, 406 U.S. 404, 413, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972).

We therefore return to the proposition that the "victims" of the subject discrimination are all defendants in criminal cases in the Central District that are residents of that district. The discrimination is in the failure to accord them trials by juries drawn entirely from among the residents of the district where they live. Any differences in the racial composition of the juries resulting from such discrimination are due to the happenstance of ethnic distribution and concentration, and do not violate constitutionally protected interests. It is therefore concluded that the present case does

3. In this connection, it is urged on behalf of the petitioners that the Central District contains a concentrated residential grouping of black people that are substantially different from the rest of the community with respect to matters of culture, thought processes, and even language. It is suggested that this segment of the community simply cannot achieve an adequate understanding of, and cannot be understood by, other residents of the county. The asserted conclusion is that to diminish the numbers of such people from

a jury trying a defendant from the same area creates an unconstitutional discrimination against him. Such an argument, if accepted, would prove too much: It would mean that people from the area so described are not competent to serve on juries of the Central District, which juries are called upon to try people of all races and cultures; it would also mean that a defendant from such an area could be understood, and thus tried fairly, only by a jury composed entirely of residents of that limited area.

not involve discrimination against a "suspect" class, within the meaning of *Rodriguez*.

The next facet of the framework of inquiry into the alleged "equal protection" violation is as to whether the discrimination "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *See* San Antonio Independent School District v. Rodriguez, 411 U.S. at 17, 93 S.Ct. at 1288, 36 L.Ed.2d at 33 (page 32, *supra*). In announcing this test, Mr. Justice Powell found it significant to consider whether there had been an *absolute deprivation* of a constitutional right as contrasted with a comparative diminution in the opportunity to enjoy such right.

 Of course, the right to jury trial is explicit in the Constitution, and such right includes the right that the jury shall be drawn from a list that reasonably reflects a cross-section of the community. *See* Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 97 L.Ed. 469 (1953). As is discussed earlier in this memorandum (page 31), the petitioners acknowledge that they have been accorded such right. The crux of their complaint is only that, because of the dual system of drawing juries, they have been treated differently than other defendants in that they had fewer members of their races on their juries than they would have had if the alternative portion of the dual system had been applied to them. However, the petitioners' right to trial by jury did not include the right to any particular racial balance on such jury. *See* Apodaca v. Oregon, 406 U.S. 404, 413, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). Thus, there was no deprivation of or impingement upon a fundamental constitutional right.

 Referring again to the analysis prescribed by *Rodriguez* (*supra*, page 32), in order to uphold the challenged system, it is not necessary to find that it serves a "compelling state interest." For whatever purpose such comment may be considered appropriate,

I am unable to agree with the conclusion of the majority in Adams v. Superior Court, 27 Cal.App.3d 719, 104 Cal.Rptr. 144 (1972) in its holding that the dual system here concerned meets that test. The system of local draw for the Central District, as well as for the other districts of Los Angeles County, apparently served quite satisfactorily for eighteen months without undue hardship upon the prospective jurors living in that district. And there would seem to be no compelling need to use a different system for all jury trials in that district just for the purpose of being able to accommodate the small and decreasing number of cases transferred there from other districts. If juries from a county-wide draw be deemed necessary for these occasionally "imported" matters, separate panels could readily be constituted as needed, according to unchallenged testimony by fully competent witnesses.

However, the opinion in *Rodriguez* instructs that the test for this court to apply is whether the dual system as now constituted "rationally furthers some legitimate, articulated state purpose." (See page 32, *supra*) In seeking to apply this test, federal courts are enjoined not to impose upon the states their own conceptions of the manner in which state juries should be drawn. *See* Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 97 L.Ed. 469 (1953). A pertinent admonition along these lines is contained in Chief Justice Warren's opinion in McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961):

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their con-

stitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

In light of the several reasons that are asserted for the actions by the Superior Court judges (as listed at page 29, *supra*), this court cannot hold that the challenged system rests on grounds wholly irrelevant to the achieving of some legitimate state purpose.

It is accordingly adjudged that the convictions of the petitioners were not in violation of the Constitution of the United States, and that the petitions for habeas corpus must accordingly be, and they hereby are, denied.

*A Caveat.* In Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 1635, 32 L.Ed.2d 152 (1972), the Court upheld a state statute providing for less than unanimous verdicts in certain criminal cases. Justice Blackmun joined in the Court's opinion and then wrote a separate concurrence in which he said that he voted to uphold the statute, not because he thought it was a wise one, but only because he could not conclude that the system was constitutionally offensive. He added, "Were I a legislator, I would disfavor it as a matter of policy. Our task here, however, is not to pursue and strike down what happens to impress us as undesirable legislative policy." 406 U.S. at 366, 92 S.Ct. at 1635.

Encouraged by that authoritative example, I express a similar sentiment here and commend to the judges of the Los Angeles County Superior Court a further reexamination of the challenged system. The requirement of a different type of draw for the Central District, with its substantial effect upon the racial composition of the juries impaneled there, has been a divisive force in the community and among the judges of the Superior Court; and it certainly is bitterly resented by many members of the bar that participate in jury trials in Los Angeles.

The record reveals that the present system was reestablished some months after complaint was made by an attorney for a corporate litigant about there being too many dark faces on a particular jury panel. This type of incident is inferred by many to constitute the real reason for the change, and nothing in the testimony to the contrary by Superior Court officials, or in Justice Ford's opinion, or in this memorandum, can begin to dispel that widely held conviction.

According to the record, the District Attorney of Los Angeles County testified to the belief that a system for drawing juries should be uniform throughout the county, that the present dual system, although constitutional, is unfair, and that blacks (and presumably members of any other racial minority) as a class are no less capable as jurors than any other groups of citizens. I share that view as reflecting the essence of the principle of even-handed administration of justice in a Government of, by, and for the people. And I am convinced that the judges of the Superior Court, upon being requested to consider the matter, will be of the same belief.