OPINION OF THE COURT
Budd G. Goodman, J.
Defense counsel moved to challenge Alec Naiman, a prospective juror, for cause on the grounds that his client will be denied a fair trial under the Sixth Amendment to the United States Constitution if Mr. Naiman is allowed to sit as a juror.
Defendant, Herberto Guzman, is charged with criminal sale of a controlled substance in the third degree. He speaks no English and is assisted by a court-appointed Spanish language interpreter, who is herself blind.
The novel issue in this case arises under the newly enacted juror qualification statute of the Judiciary Law.[1]
*458 Alec Naiman appeared in this courtroom as part of a pool of potential jurors. He is 29 years old; he speaks, understands, reads, and writes English fluently; he is a United States citizen and a life-long resident of New York City; he has never been convicted of a crime; he is a student of anthropology at New York University, and is sane, intelligent and articulate. Alec Naiman is also profoundly deaf.
THE STATUTORY ENGLISH REQUIREMENT
Alec Naiman communicated with the court through a court-appointed “sign language interpreter”. For purposes of clarity in this case, the interpreter will be referred to as a signer, since she was not communicating with Mr. Naiman, nor he with her, in American Sign Language. American Sign Language (ASL) is a separate language from English with its own grammar and syntax.[2] The person who signs with a deaf person in ASL is, therefore, a translator or interpreter just as any foreign language interpreter serves that function in a court proceeding. Mr. Naiman spoke, however, in signed English,[3] which is not a separate language — it is English in a different form. Thus, the “interpreter” was not translating or interpreting but merely transmitting. When a person communicates in signed English, the exact words in English are transmitted from the speaker through the signer to the listener, but *459 always in English. This is done by means of hand signals which represent each of the words in English, just as a group of characters typed on a page represents a word in English. The signer can be analogized to a modem, a device which allows one computer to “talk” to another over a transmission line. It allows for transmission between two things which otherwise could not communicate. The word itself is an acronym for modulator-demodulator. The modem transmits or receives a message and passes it on. It does not translate. Another way to look at the signer who uses signed English is as an input/output buffer. This device allows one electronic device to “talk” to another. It is called a buffer because one computer sends at a slightly different rate than the other receives. Again, it is the same language, merely a different form. It is clear that in order for a deaf person to meet the statutory language requirement for jury service that person must understand and communicate in English using either signed English, or lip reading, or finger spelling or any combination thereof as the mode of communication. There are those in the deaf community who know only American Sign Language and do not know English. These people would not meet the statutory English requirement any more than would any other non-English-speaking person. Alec Naiman, however, meets that requirement.
The court, the Assistant District Attorney, and defense counsel had an opportunity to question both Mr. Naiman and the court-appointed interpreter. The interpreter was questioned and found qualified by the court, sworn and instructed as to her function in the proceedings. The District Attorney found no reason to challenge Mr. Naiman. However, defense counsel, at the conclusion of his voir dire, moved to challenge him for cause.
The issue before the court is whether an otherwise qualified deaf person may be challenged for cause in a criminal trial solely on the basis of his deafness.
Section 510 of the Judiciary Law was amended on September 1, 1983. Prior to that date the law read, in pertinent part, “In order to be qualified to serve as a juror * * * a person must * * * [b]e in the possession of his natural faculties and not infirm or decrepit.”[4]
*460 The result, under that language, was the disqualification of the sensorially impaired.[5] The Legislature amended the statute to read: “In order to qualify as a juror a person must * * * [n]ot have a mental or physical condition, or combination thereof, which causes the person to be incapable of performing in a reasonable manner the duties of a juror.”[6]
The Legislature, in its memorandum, stated that the purpose of the proposed changes was “to remove the arbitrary prohibition against persons with ‘physical infirmity’ from being impanelled for jury duty and, by so doing, to increase the number of people who would be available for jury duty, while at the same time, making New York’s law accord with the regulations promulgated and proposed under Section 504 of the Rehabilitation Act of 1973, as amended.”[7]
The statute, it noted, was amended to abrogate the systematic exclusion of the handicapped “without regard to the individual’s ability to perform the duties of a juror. This form of pre-determination, based upon the presence of a handicapping condition, contravenes Federal Regulations made under Section 504 of the Rehabilitation Act of 1973, as amended; and in particular the regulations applicable to court systems made by the Department of Justice *461 (28 CFR Part 42) * * * [T]he present law by systematically excluding disabled persons from jury panels can threaten the validity of our jury system and the convictions obtained.”[8]
The Legislature intended the proposed amendment to remedy the problems created by the old language “without impacting unfavorably] on the jury system by shifting the emphasis from, pre-determination to the capability of the individual to perform the duties of a juror in a reasonable manner”.[9]
Senator John E. Flynn, in a letter to the Governor’s office, stated that prior to the enactment of the statute the provision which referred to “ ‘natural faculties’ ” excluded “as jurors certain disabled individuals on the basis of their perceived inability to perform functions which have no effect on actual jury service.”[10]
A canon of statutory construction says that “As a general rule, the legislative intent with which statutes are enacted is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and from the objects and remedy in view * * * and in passing upon matters of legislative intent and competence, the courts do not merely read the bare end product of the legislative labors, but rather they read the statute in light of the state of facts which were found by the Legislature and which prompted the enactment.” [11]
The mischief which the Legislature sought to remedy was the predetermination of the incapacity of individuals with physical disabilities to serve as jurors. In order to advance the remedy, the qualifications of the individual prospective juror, as they relate to an individual case, should be examined.
JUROR QUALIFICATION
In any case when a prospective juror does not have a sufficient grasp of the English language, or is obviously biased in some way, or is, for any other statutory reason, *462 incompetent to sit on a particular case, a challenge for cause will be granted. Thus, with respect to a disability, the court must determine whether the scope of a disabled person’s impairment would preclude him from serving as a reasonable juror or would adversely effect the rights of the litigants.[12]
There is certainly no question that deaf persons are as capable as anyone else of understanding legal jargon or any other technical jargon used by expert witnesses.[13] The deaf are found in many highly technical professions including medicine, engineering, and the law.[14]
Defense counsel argues, in essence, that no deaf person can sit as a reasonable juror since we cannot be sure that the translation by the interpreter is accurate; and that the deaf person will lose words if more than one person speaks at a time; and that the deaf person cannot hear subtle nuances of vocal inflections which are crucial in determining the credibility of any witness; and that the sanctity of the jury deliberations will be violated by the presence of the interpreter; and that the presence of the interpreter will be too disruptive to both the trial and the deliberative process[15] and will shift the focus of the trial from the defendant to the deaf person.
Defense counsel’s challenge is based on a lack of information.
More than 100 years ago, Justice Oliver Wendell Holmes broke the accepted view of how legal rules are formed. He encourages us to use “[i]n the place of sterile, deductive reasoning * * * sensitive analysis and weighing of competing policy considerations.”[16] Holmes postulated that: “[t]he felt necessities of the time * * * even the prejudices which judges share with their fellow-men, have had a good deal *463 more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation’s development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics.”[17]
The blunt constraint that no deaf person can be qualified to sit as a juror is a passé conclusion which defies and has no connection with reality or common sense. The law is a reflection of life and its realities and as Holmes taught us “[t]he life of the law has not been logic: it has been experience.”[18] It is imperative that we here recognize the crucial role which uninformed and irrational thinking has played in the perpetuation of this misapprehension about the deaf and reject such thinking. No longer can we lump all deaf persons together and discard them in a faceless silent heap, as in the past, on the assumption that they are all the same — inept and unable to fulfill this requirement of citizenship.
The truth of the matter is that “they”, like blacks, Jews and women, to name but a few, are not all the same and anyone who has had any contact with the deaf knows that. Truly “[i]t is revolting to have no better reason for a rule of law than that it was laid down in the time of Henry IV.”[19] Today it is well known that with appropriate education, the deaf can learn and do anything a hearing person can.
We, as members of a community which profoundly affects the lives of our fellow citizens, must always keep our minds open and alive to new information lest we fall victim once again to the same kind of static prejudiced thinking which has plagued our populace throughout the years with regard to such issues as race, gender and age. Thought in legal community, and therefore the law itself, changes slowly and ponderously, but change it does and must if it is to continue to have a raison d’etre. It is time now to reappraise our previously held ideas on the individual abilities of the deaf. Both information and experience have shown this court that those ideas are in fact outdated and thus no longer applicable.
*464 Recent information regarding the deaf, how they communicate generally and how they have functioned as jurors in other jurisdictions forms the basis of this decision.[20]
There are at least nine jurisdictions in the United States which have seated deaf jurors.[21] The deaf have served with distinction in those jurisdictions and have been found to be an unexpected asset to the deliberative process.[22]
While it is true that one can never be sure that the deaf person has heard everything during both the trial and the *465 deliberations, because sometimes more than one person speaks at a time, the same is also true of all the hearing jurors in the room. How many times have both the Judge and the court reporter admonished the participants to speak one at a time so that each person may be heard and a proper record made? The one-at-a-time speaking rule is not new to our system. Additionally, many people who are not deaf have hearing impairments to greater or lesser degrees. They may not need a hearing aid but nonetheless lose many words and we are never aware of it. Further, we all have different attention spans and phase in and out of focus. These are some of the reasons for having more than one person sitting on a jury panel.
With respect, to the accuracy of the signer’s transmission, the court administrators should, in the future, examine and define the qualifications necessary and impose standards; we should then proceed as we do with court-appointed foreign language interpreters. When any non-English-speaking witness (including a defendant) testifies, the entire jury, the Judge, the attorneys, the court reporter and, consequently, all future appellate courts, are dependent on the English record made by that interpreter. If we do not trust the skills of that person then we have no trial at all.
With respect to the issue of the loss of subtle nuances of vocal inflection — when the foreign language interpreter translates for a witness no one in the courtroom can evaluate the credibility of that witness based on subtle nuances which are supposed to be so all important to a determination of credibility. Further, there does not seem to be any conclusive authority to support the proposition that it is the perception of subtle inflections in the voice of a witness which leads a juror to a more just or accurate or truer finding of the facts. In fact, usually it is the content of the testimony that the listener believes or disbelieves rather than any inflections, subtle or otherwise. Voices can get louder or softer, break or tremble out of nervousness or anxiety, but that is true of the truth teller as well as the liar.
Alec Naiman speaks English well, but he speaks with the flat affect of one who has never heard vocal inflection. However, I never had a problem understanding his meaning or emotion. I understood when he was nervous, angry, *466 guarded, insulted, amused and disappointed. I cannot point to the specific things that sent those signals, but none of them were from the subtle nuances or inflections in his voice. Frankly, I believe that most ordinary people do not have subtle nuances in their vocal inflections. Mostly, such subtlety is reserved for great artists such as Gielgud and Streep and we marvel at their ability to convey so much with so little. They work long and hard to achieve those subtleties. Further, any such nuances are always open to interpretation. In reality, no juror, whether hearing or deaf, hears everything that should be heard, interprets everything as it is meant to be interpreted, processes everything in the same fashion or reaches a decision in the same way. Some jurors are better educated than others, some are more observant, some more aware of auditory cues and some unfortunately hear and understand little or nothing that has gone on in the proceedings.
It should be noted that a qualified signer can express the speaker’s intonation, inflection, syntax and other variations of speech through a combination of facial expressions and movements. These expressions and movements are not a commentary on the state of mind of the declarant but are indications of such things as pauses, modulations of voice, and the speed of the declarant’s speech.[23]
During the deliberative process any questions or confusion should be discussed; the lapses of concentration should be filled in; differences in impressions should be debated, considered and resolved. That is what the deliberative process is all about, else would it not be sufficient for the jury to consist of a single person? We cannot, in reality, be sure of what any juror has seen or heard or understood or interpreted. We live in an imperfect world and the jury system is our imperfect attempt to deal with that world. The best we can do is to try to find 12 citizens, imperfect as they are, to listen, observe, consider, discuss, and reach the best verdict, the fairest verdict they know how, given their imperfections. That is the most we can ask, and to my unending surprise, by whatever route they travel, juries by and large arrive at substantial justice. There is no reason to believe from the experience in other jurisdictions and from listening to and observing Alec Naiman, as I have, *467 that Mr. Naiman would not do as fine a job or better than many of the hearing jurors.
THE RIGHT TO A FAIR TRIAL
Both the defense and the prosecution are entitled to a fair trial before an impartial jury, that is, a jury drawn from a cross section of the community.[24] However, that right is limited. It entitles both parties to the inclusion of cognizable groups in the pool of jurors from which a panel will be drawn. It does not entitle either party to demand the exclusion of any such group.
The Southern District, in United States v Guzman,[25] set down standards to be used in determining the existence of a cognizable group. “A group to be ‘cognizable’ for present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace.”[26]
The deaf are a cognizable group.
*468 (1) The deaf community has a definite and unshifting membership with a characteristic which defines and limits the group; its membership cannot be arbitrarily selected;[27]
(2) The deaf community has members who share a common thread of experience that gives the group cohesion;[28] and
(3) The deaf have a community of interest which cannot be adequately represented by the rest of the populace. The deaf, like other groups previously found to be cognizable,[29] have a life experience which is vastly different from the rest of society and thus it seems unlikely that any other group could represent adequately that interest.[30]
Historically, the deaf have been viewed and treated as a distinct group separate from and inferior to the rest of society. This is exemplified in the treatment of the deaf with respect to all aspects of their life from education through the imposition of legal disabilities.[31]
From biblical times, when the deaf were considered to be possessed by evil spirits, to the present, the deaf have been viewed as intellectually slower than hearing persons.[32] At common law the deaf were considered to be propter defectum (incompetent on account of or for some defect).[33] Disqualifications for age and feeblemindedness also belong to this class. The anachronistic misperception that the deaf are intellectually slower has been repudiated scientifically. That repudiation notwithstanding, nearly every newspaper story about Mr. Naiman called him “deaf and dumb”. This cannot be excused as “just an expression” any more than “Hymie”[34] or “Nigger” can be so excused. Since “dumb” cannot mean speechless — Mr. Naiman is extremely verbal and communicates well — there is only one thing it can mean.
The Supreme Court, in Taylor v Louisiana, said of women and cross-sectionalism: “[i]f the fair-cross-section rule is to govern the selection of juries, as we have con- *469 eluded it must, women cannot be systematically excluded from jury panels from which petit juries are drawn. This conclusion is consistent with the current judgment of the country, now evidenced by legislative or constitutional provisions in every State and at the federal level qualifying women for jury service.”[35]
The same can be said of the deaf. It is only too clear that the deaf will bring to the judicial process their own perspectives and values, thus influencing both the deliberations and the result. Like members of any race or national origin, like members of any educational or economic class, like members of either sex, the deaf will bring “a flavor, a distinct quality”[36] of their own which would be lost if they are excluded. “The presence of a juror who is a member of a particular group may make available desired information and may provide a different perspective on the community. Those additions may be crucial, because the course of a jury’s deliberations will often depend on the familiarity of the jurors with all facets of the community and on their willingness to believe the testimony of particular witnesses and the defendant.”[37]
In Peters v Kiff,[38] the Supreme Court held that “a State cannot, consistent with due process, subject a defendant to *470 indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and the laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process * * * [T]he exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases * * * When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.”[39]
*471 Furthermore, in Smith v Texas,[40] the court held that any jury selection scheme, although not facially discriminatory, but which “by reason of the wide discretion permissible in the various steps of the plan, [may be] applied in such a manner as practically to proscribe any group thought by the law’s administrators to be undesirable”[41] is unconstitutional.
Thus, to include deaf persons in a jury pool, because exclusion would be contrary to State and Federal law, but to challenge every deaf person for cause solely on the basis of deafness, notwithstanding his being otherwise qualified, is to do in the vestibule what could not be done outside the front door. This court cannot and will not assume a posture which circumvents the intent of the Legislature — a posture which observes the law in form but flouts it in substance.
THE THIRTEENTH PERSON IN THE JURY ROOM
The purpose of the rule precluding persons other than jurors from being in the jury room during deliberations is to protect and guarantee the privacy of the deliberative process, and to prevent the inhibiting effect that such presence would have on vigorous discussion necessary to that process.
In Clark u United States,[42] the court explained that the need for privacy and secrecy arises out of the danger that “[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.”[43]
It has been said that the inviolability of the jury deliberation process is so pervasive as to disallow even an alternate’s presence.[44] However, the so-called “cardinal princi *472 pie” of jury secrecy is not so immutable as some in the legal community seem to think.
In Williams v Florida[45] the court held that in order to determine the constitutionality of a particular feature of a jury system “[t]he relevant inquiry * * * must be the function that the particular feature performs and its relation to the purpose of the jury trial.”[46]
The Seventh Circuit addressed this very issue in Johnson v Duckworth,[47] where it stated that “a state court may constitutionally require an alternate juror to observe the jury’s deliberations over the defendant’s objection”.[48] The defendant contended that the alternate’s presence during deliberations violated his rights under the Sixth and Fourteenth Amendments to the Constitution. He argued “that any person who is not permitted to participate in the jury’s discussion and vote must be considered a stranger to the deliberations, and that allowing any stranger to observe deliberations violates the ‘cardinal principle’ that jury deliberations must be secret and private in every case.”[49]
The Duckworth court explained that jury privacy is not “a constitutional end in itself; it is, rather, a means of ensuring the integrity of the jury trial.”[50] Sometimes that privacy must be breached in order to protect the defendant’s right to a jury trial.[51] Thus, the question in Duckworth was, as it is here, whether the presence of the stranger was the kind of intrusion upon the jury’s privacy “that will tend to stifle the jury’s debate [and therefore] endanger * * * the defendant’s right to trial by jury.”[52]
The answer is no.
The rule which excludes persons other than jurors from the jury room during deliberations in reality pertains to officers of the court such as bailiffs, Judges, or counsel. The presence of the signer is a different matter entirely.
*473 The role of the signer is not that of a participant or an authorized official of the court but is that of a communications facilitator such as a telex or typewriter or telephone or hearing aid or microphone. The 12 jurors and the signer will be made aware by the court of the purely mechanical function of the signer and will have been instructed strongly as to that function, how it is to be carried out and the consequences if such instructions are, in any way, violated.[53] They will proceed with their individual functions in a good commonsense fashion as they do every day in courts all over the Nation. We depend on our juries to use their own good common sense in judging cases involving millions of dollars and life and liberty every day. Why should we think them incapable of dealing with so simple an instruction as this? To think them incapable is to exhibit a disdain for the very people and process upon which our entire judicial system is based.
A simple everyday reality which cannot be ignored is that the jury panel of which the deaf person is a member and to which the signer is attached will have “lived” together for a number of days before that case ever goes to deliberation. The relationship of the signer to the process will be formed, the functions of all members delineated and adjustments made long before they ever enter the jury room to deliberate. Thus, the deliberative process will be merely an extension of that relationship and will continue as it had before.
Finally, and most importantly, practical experience has shown that none of the problems anticipated have arisen. In those jurisdictions where the deaf have been seated, interpreters accompanied the jurors into the jury room, and it is my understanding that there has never been a *474 breach of confidentiality, nor problems with the signer or lip-reader breaching the oath of noninvolvement, nor any problem with respect to the panel not being able effectively to deliberate because of the deaf person.[54]
There is a trend beginning to emerge in this country with respect to the seating of the deaf on juries. This trend is developing out of a growing awareness of the capabilities of such citizens. New York’s Legislature has been historically a leader, and is again in the forefront of this trend, being sensitive and responsive to the changing conditions in our society. This court has a responsibility to do the same.
Today the deaf go to school from the earliest grades through graduate school and into the working world, along with their hearing peers. Their disability has nothing to do with the way their intellect functions.
The deaf are not poor creatures to be patronized by us, congratulated on their individual efforts to overcome their handicaps and summarily brushed aside. Like members of any other cognizable group, the deaf are a part of our community and must be considered, evaluated, and finally either accepted or rejected for service as individuals just as any other citizen.
The grounds for exempting the deaf from jury service have vanished. People who are otherwise qualified cannot be challenged for cause under New York statutory law, or the Constitutions of this State or of the United States, solely on the basis of deafness.
If there were something about Alec Naiman in relation to this case which would affect his ability to function as a reasonable juror, then he, like anyone else, would be vulnerable to a challenge for cause. However, neither the defense counsel nor any independent examination by this court has disclosed any reason why Alec Naiman should be challenged for cause in this case. The motion is therefore denied.

. Judiciary Law, § 510, subd 3 (amd by L 1983, ch 474, eff Sept. 1,1983). A number of States have already amended their juror qualification statutes in order to abrogate the exclusion of the sensorially impaired from the jury pool.
Subdivision (b) of section 205 of the California Code of Civil Procedure provides: “A person shall not be deemed incompetent, and shall not be excluded from the qualified jury list solely because of the loss of sight or hearing in any degree”.
*458 Chapter 913 of the Massachusetts Acts (codified as amdt to Mass Gen L Ann, ch 234, § 4) was approved on May 22, 1980, and provides: “No person shall be disqualified from appearing on [a] list [of prospective jurors] solely because such person is blind.” Article 2133 of the Texas Civil Statutes Annotated provides: “A person who is legally blind is not disqualified to serve as a juror in a civil case solely by reason of his legal blindness”. Subdivision (3) of section 2.36.070 of the Washington Revised Code Annotated states that “a person shall not be precluded from the list of prospective jurors because of loss of sight in any degree.” Subdivision (1) of section 756.01 of the Wisconsin Statutes Annotated was amended to provide the court with guidance in interpreting the provision of the State juror qualification law that jurors are “[pjersons who are * * * possessed of their natural faculties”. The amendment requires in subdivision (2) that this provision not be interpreted to “exempt, exclude or disqualify a person from jury service on the ground of infirmity because of a physical condition” (Wis L 1977, ch 449, § 330, eff Aug. 1, 1978).
The Oregon juror qualification law provides that “[a] person who is blind or physically handicapped shall not be deemed incompetent for jury duty or have his or her name excluded from a jury list or jury box on the basis of blindness or physical handicap alone.” (Ore Rev Stats, 8 10.030, subd [2].)
Only four States expressly exclude the sensorially impaired from jury service. (Ark Stats Ann, 8 39-102; Iowa Code Ann, 8 607.1; NC Gen Stats, 8 9-3; Tenn Code Ann, 8 22-1-102.)

. See Stokoe, Sign Language Structure (1963).

. See, generally, Meyers, The Law And The Deaf 45 (1968); Klima and Bellizi, The Signs Of Language (1979); Baker and Padden, Paper Focusing On The Nonmanual Components Of ASL; Gustason and Zawolkow, Using Signing Exact English In Total Communication. (See n 53 infra.)

. Judiciary Law, former § 596.

. Matter of Lewinson v Crews, 28 AD2d 111.

. See n 1, supra.

. Memorandum, an act to amend the Judiciary Law in relation to qualifications for jury duty — purpose of the bill. (Bill Jacket, L 1983, ch 474.)
Section 501 of the Rehabilitation Act of 1973 (87 US Stat 355, US Code, tit 29, § 701 ei seq. [Act]) states that the purpose of the Act is to prohibit discrimination on the basis of handicap in any program receiving Federal financial assistance. Section 504 states that “[n]o * * * qualified handicapped [person] shall, solely by reason of his handicap, be excluded from the participation in * * * any program * * * receiving [or benefiting from] Federal financial assistance”. (45 Fed Reg, No. 108, p 37622.)
In 1982, Charles Peck brought a motion for summary judgment against the County of Alameda to be reimbursed for moneys he had paid to hire a signer to assist him in performing his duty as a juror. (See Peck v Alameda, No. C80-3692 Jell.)
The Department of Justice submitted an amicus curiae brief in the case which stated that section 504 was meant to cover the cost of the services of a signer when a deaf juror participated in the jury process. The issue presented was “whether, in order to have the opportunity to function as a juror once chosen to do so, a deaf person is entitled to interpreter services under Section 504.” (28 CFR part 42; see Peck v Alameda, supra, p 3.)
Mr. Norman Goodman, New York County Clerk, informed the court that in his judgment, section 510 of the Judiciary Law and section 504 of the Act require the sensorially deprived to be included as part of the jury pool and further that it is incumbent upon the State to provide an interpreter for Mr. Naiman. Therefore, Mr. Goodman contacted the New York Society for the Deaf, and, at the State’s expense, provided an interpreter for Mr. Naiman. (See, generally, Ashby, Juror Selection And The Sixth Amendment Right To An Impartial Jury, 11 Creighton L Rev 1137.)

. Bill Jacket, op. cit.

. Ibid.

. Letter from Senator John Flynn to Alice Daniel (June 28,1983 [discussing intent of amdt], Bill Jacket, op. cit.).

. McKinney’s Cons Laws of NY, Book 1, Statutes, § 95; see, also, Matter of New York Life Ins. Co. v State Tax Comm.., 80 AD2d 675, affd 55 NY2d 758.

. “The trial court is invested with a wide discretion in determining the competency of the jurors” (Lias v United States, 51 F2d 215,217, affd Per Curiam 284 US 584; Lyda v United States, 321 F2d 788, 791; see Bell v O’Connor Transp., 94 Idaho 406).

. See, generally, Lytte and Silver, Technical Sign Language For Television Production; Woodward, Signs Of Drug Use; Jamison, Signs For Computer Terminology.

. One member of the population, Michael Schwartz, is an attorney who works in the Appeals Bureau of the Manhattan District Attorney’s office and argues cases, with the assistance of a signer, before the Appellate Division of the Supreme Court of the State of New York. Another attorney, Michael Chatoff, has argued before the Supreme Court of the United States.

. In order for the presence of the interpreter not to interfere with either the trial or the deliberative process the signer should stand beside and slightly behind the speaker so that the deaf person can easily see both the speaker and the signer.

. Kornstein, Holmes’s “Common Law” at 100, NYLJ, June 17, 1981, p2, col 3.

. Holmes, The Common Law, lecture 1, p 1.

. Ibid.

. The Practical Cogitator, p 395.

. See, generally, Deaf Persons In Professional Employment, pp 74, 86-87 (1968). There are more than 13 million people in the United States with hearing impairments, according to the most recent census of the deaf population, of which approximately 150,000 live in New York and are considered profoundly deaf. See Schein and Delk, The Deaf Population Of The United States, p 132 (1974) (hereinafter cited as The Deaf Population); Due Process: The Deaf And The Blind As Jurors, 17 New England L Rev 119.

. (1) California “It just seemed very natural,” said Los Angeles Municipal Court Judge Marion Obera who seated the deaf juror under California’s recently enacted statute (The Silent News, April, 1981). She observed that neither the deaf person nor his interpreter interfered with or delayed the proceeding. The Deputy Public Defender said that she did not slow or direct the testimony to that juror.
(2) Maryland (June 21,1982) Juror in Montgomery County Circuit Court used an oral interpreter; the interpreter mouthed the words at a normal rate of speed.
(3) Colorado (Gazette Telegraph, 1982) Fourth Judicial District Judge Joe Cannon. The juror was seated under Colorado’s new legislation which says that “[n]o person shall be deemed to be incapable of jury service solely because of impaired vision or hearing in any degree.”
(4) Oregon (Washington Post, Oct. 22, 1983) Portland, Mulnomah County Circuit Court.
(5) Texas Judge Randell Riley stated in conversation with my law clerk that after the novelty of the presence of an interpreter wore off, there was absolutely no problem, no disruption at all in court or during deliberations. He instructed the interpreter “to make no comment of her own about the case but to repeat only that which was being said by the deliberating jurors.”
(6) Florida (St. Augustine Record, June 19, 1982) Circuit Court Judge Richard O. Watson referred to jury service as a “basic right” during an interview, with respect to the seating of a deaf woman on the Grand Jury under the Florida statute which prohibits discrimination based on race, religion or physical handicap.
(7) Washington (Seattle Post Intelligence, Aug. 20,1979, p 5; State v Scalese, Criminal Cause No. 90771, Peter M. Steele, J.) The first deaf person in the country sat on a criminal case. The Judge stated in a phone conversation on March 15, 1984 that the presence of the signer had presented no problem either during the proceedings or during deliberations. Defense attorney said after the trial that he had been sure from the beginning that the deaf person could be a fair and capable juror. His client was acquitted. The parties stipulated to the presence of the interpreter in the jury room. (GCEH Newsletter, Sept., 1979, deaf jurors have served in both civil and criminal cases as have the blind.) In the O’Brien case (Washington State) it was reported that the jury decided that when anyone spoke, that person would raise his (her) hand so that Mr. O’Brien would know who the ideas were coming from.
(8) Illinois (Chicago Tribune, March 13, 1982, p 22) Judge Edward Hofert, Circuit Court, the deaf juror was seated over the objections of the defense attorney (civil case).

. In the Chicago case, Judge Hofert, in a letter dated March 21,1984, informed me that his jury found the deaf juror an invaluable asset in the deliberative process. She was able to recall testimony verbatim. This, they said, indicated to them a compensatory skill which they found helpful. “As to various people speaking simultaneously, the jury, itself, recognized the problem and were more careful in their speech and more courteous to each other.”

. See Registry of Interpreters for the Deaf, Code of Ethics, p 62.

. See Smith v Texas, 311 US 128; Thiel v Southern Pacific Co., 328 US 217; Ballard v United States, 329 US 187; Hernandez v Texas, 347 US 475; Duncan v Louisiana, 391 US 145 (which extended the Sixth Amendment guarantees to the States); Apodaca v Oregon, 406 US 404; Taylor v Louisiana, 419 US 522; see, generally, Daughtrey, Cross Sectionalism In Jury-Selection Procedures After Taylor v. Louisiana, 43 Tenn L Rev 1, 7-82; see, also, Saltzburg & Powers, Peremptory Challenges And The Clash Between Impartiality And Group Representation, 41 Md L Rev 337, 359; Limiting The Peremptory Challenge: Representation Of Groups On Petit Juries, 86 Yale LJ 1715, 1716; People v McCray, 84 AD2d 769, affd 57 NY2d 542, cert den_US_, 103 S Ct 2438.

. 337 F Supp 140 (age not a basis for finding a cognizable group). Groups which have been found to be “cognizable” are those which are defined by race (see, e.g., Smith v Texas, supra), ethnic or national origins (see, e.g., Hernandez v Texas, supra), sex (see, e.g., Taylor v Louisiana, supra), economic status (see, e.g., Thiel v Southern Pacific Co., supra), and education (see, e.g., United States v Butera, 420 F2d 564,571). Since Duncan (supra) extended the Sixth Amendment right to the States, the same cross-sectional mandate applies to both civil and criminal cases.

. United States v Guzman, supra, at pp 143-144; see, also, United States v Greenberg, 200 F Supp 382 (USDC, SDNY); Duren v Missouri, 439 US 357.

. Guzman, supra, at pp 143-144.

. Guzman, supra.

. Guzman, supra.

. Guzman, supra.

. See Taylor v Louisiana, 419 US 522, supra.

. Mark 9:17; see, generally, Glass, Deafness And Its Effects: Educational and Psychosocial Aspects Of Deafness, p 66 (Hardy & Culls ed, 1974).

. Black’s Law Dictionary (5th ed), p 1098.

. Jessie Jackson, presidential candidate, campaign of 1984.

. Taylor v Louisiana, supra, at p 533.

. Ballard v United States, supra, at p 194.

. 86 Yale LJ, op. cit., at p 1728.

. 407 US 493. Although this case was decided on due process grounds, Justice Marshall spoke (p 498) of the “kinds of harm that flow from discrimination in jury selection.” He said (pp 498-499) that the exclusion of any “well-defined class of citizens * ** * denies the class of potential jurors the ‘privilege of participating equally * * * in the administration of justice,’ [Strauder v West Virginia, 100 US 303], 308, and it stigmatizes the whole class, even those who do not wish to participate, by declaring them unfit for jury service and thereby putting ‘a brand upon them, affixed by law, an assertion of their inferiority.’ ”
It is interesting to note that the Congress of the United States has recognized jury duty as a right and has made disqualification on account of race, color or previous condition of servitude in Federal or State courts a crime. (US Code, tit 18, § 243; see, also, Abbott v Mines, 411 F2d 353, 355, where the court said that women “not only have the right to vote but also the right to serve on juries.”). For further discussion on jury service as a right, see 1967 Senate hearings (for cite see 43 Tenn L Rev, op. cit., p 72, n 303) where Professor Hans Zeisel, codirector of the University of Chicago Jury Project, commented on the increasing “democratic congruence between the right to vote and the duty to vote, and the right and the duty to serve as jurors.” (See, also, Apodaca v Oregon, 406 US 404, 413, supra, where the court said “[n]o group * * * has the right to block convictions; it only has the right to participate in the overall legal processes by which criminal guilt and innocence are determined”; White v Crook, 251 F Supp 401, 408: “[J]ury service on the part of the citizens of the United States is considered under our law in this country as one of the basic rights and obligations of citizenship * * * Jury service is a form of participation in the processes of government, a responsibility and a right that should be shared by all citizens”; Peters v Kiff, 407 US 493, supra; Penn v Eubanks, 360 F Supp 699 *470 [where the court analyzed the interest of a juror as fundamental]; People v Moss, 80 Misc 2d 633; see, generally, Lehman, What You Need To Know For Jury Duty, pp 1-2 [1968], in which an experienced California juror advises: “It may come as a surprise to you that this blunt summons is an honor. It may give you a hunted feeling, but it is, nonetheless, a privilege and a distinction. If you think about it, you will probably discover you feel ennobled * * * First of all, the summons is recognition that you are a citizen of the United States. The jury system is one means of operating a government ‘of the people’. Through it the people share in judicial power, just as by voting for a constitutional amendment they take part in making the laws. Second, being called to jury service is recognition that you are a resident in good standing of the community in which you live.” See, contra, Bailey v State, 215 Ark 53; Goldblatt v Board of Educ., 52 Misc 2d 238 [where the courts, following Fay v New York, 332 US 261,277, held that jury service is a duty for men that requires their participation but a privilege for women which could be exercised at their option].) It should be noted that it took Arkansas at least 20 years to change that situation. To this day, Arkansas has a statute which disqualifies deaf persons while other more enlightened States have proceeded to change their statutory language either to disallow the per se exclusion of perceptually handicapped people or to structure them in such a way as to allow courts on a case-by-case basis to consider the qualifications of individuals as they come before the court. In Carter v Jury Comm. (396 US 320,330), Mr. Justice Stewart said that “[w]hether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others * * * than it may invidiously discriminate in the offering and withholding of the elective franchise.” This statement equates jury service with voting, which is a fundamental right, and does not exclude the possibility that jury service is a right. Thus, the Supreme Court has indicated that those who have been excluded from the jury pool have the right to bring suit and a right not to be excluded which is as strong as the right to vote.

. 407 US, at pp 502-504. It is interesting to note that from Kiff (supra), Thiel (supra), Taylor (supra) and Duncan (supra) it becomes clear that the equal protection of citizens to sit on juries is not in conflict with the due process rights of defendants. (See, also, Williams v Florida, 399 US 78, where Justice Marshall found a constitutional basis for the proposition that the “exclusion of a discernible class from jury service injures not only those defendants who belong to the excluded class, but other defendants as well” [Peters v Kiff, supra, at p 500].) In Kiff, three of the Justices found that the principles of due process should govern the issue of who has standing to attack the exclusion of blacks from the Grand Jury. Ultimately, we find that all defendants, whether or not they are *471 members of the excluded group, and those potential jurors who are members of the group excluded systematically have standing to attack the juror selection process. (See, also, Carter v Jury Comm., 396 US 320, supra; see, also, Bradley v Judges of Superior Ct., 372 F Supp 26.)

. 311 US 128.

. 311 US, at p 131.

. 289 US 1.

. 289 US, at p 13; see, also, Williams v Florida, supra.

. Eckstein v Kirby, 452 F Supp 1235. Eckstein was decided on equal protection grounds and therefore the court does not feel bound by the results therein. Furthermore, Arkansas’ statute is diametrically opposed to New York’s statute on its face and in its intent.

. Supra.

. 399 US, at pp 99-100.

. 650 F2d 122; see, also, People v Valles, 24 Cal 3d 121.

. Johnson v Duckworth, 650 F2d, at p 124; see, generally, The Silent Alternate Juror: A Violation Of The Constitutional Right To Trial By Jury?, 58 Chi-Kent L Rev 765.

. 650 F2d, at p 124.

. 650 F2d, at p 125.

. See, e.g., Clark v United States, 289 US 1, 14, supra (where breach occurred to determine whether the jurors’ vote was result of a bribe); see, also, United States v Beasley, 464 F2d 468; Potter v Perini, 545 F2d 1048; and People v Valles, supra.

. Johnson v Duckworth, 650 F2d, at p 125.

. At the commencement of the proceedings the signer should be instructed to transmit verbatim everything that is said and to offer no opinions or other utterances during the trial except to transmit to the deaf juror the exact words which are spoken by the participants, according to the Code of Ethics. Prior to the sequestration of the jury, the signer should be instructed that his/her only function in the jury room will be to facilitate communications and that (s)he must not counsel, advise, or interject personal opinions or participate in any way other than as a transmitter of the spoken word. The court should instruct the jury and the signer that if the signer communicates with the jurors in any way other than as directed by the court, the jury must cease their deliberations immediately and so inform the court. A violation of the court’s instruction in this respect may subject the signer and/or jurors to criminal charges under section 215.25 of the Penal Law and under section 750 of the Judiciary Law.

. See ns 21, 22.